# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LABYRINTH, INC. and HARBOR BUSINESS COMPLIANCE CORPORATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-0327-MTZ |
| STEPHEN A. URICH, ROBERT M. URICH, and COMPLETELY COMPLIANT, LLC, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 27, 2023
Date Decided: January 26, 2024

Blake Rohrbacher, John D. Hendershot, Sandy Xu, Morgan R. Harrison, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Kira N. Lum, ROYER COOPER COHEN BRAUNFELD LLC, Philadelphia, Pennsylvania, *Attorneys for Plaintiffs*.

Jesse L. Noa, Tyler E. Cragg, Andrew Moshos, Hannah L. Paxton, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Defendants*.

**ZURN, Vice Chancellor.**

One hundred and seventy years ago, the British army experienced the painful cost of hastily executing a blundered communication. A Crimean War order instructed six hundred seventy British soldiers to "recover the heights" and assured them the support of a nonexistent infantry.[1] With heights to every side of the cavalry, the unit's commander did not know which "heights" to recover; so, he just picked one. When the commander did not see a supporting infantry, he and the calvary just charged on. No one in command stopped "to make reply," or to "wonder why."[2] "[T]hough the soldier knew [s]omeone had blundered . . . , [i]nto the valley of Death [r]ode the six hundred."[3]

The contract in this action, between a buyer and a seller, is rife with blunders and omissions. As between two reasonable interpretations, I will not just pick one now; and with contractual signals to nonexistent provisions, I will not just charge on. For today, I must deny or defer decision on the meaning of the error-ridden provisions.

---

[1] Military historians and strategists continue to study the attack, now a byword for the senseless waste of soldiers in war, to underscore the importance of military intelligence and a clear chain of command and communication. *See* Jesse Greenspan, *The Charge of the Light Brigade, 160 Years Ago*, Hist. (Oct. 28, 2019), https://www.history.com/news/the-charge-of-the-light-brigade-160-years-ago.

[2] Alfred Tennyson, *The Charge of the Light Brigade, in* The Charge of the Light Brigade and Other Poems 52 (2016).

[3] *Id.*

The rest of this opinion does not inspire any epic comparisons. It is a tale this Court hears often: a seller perpetrated fraud on a buyer before and at closing to load the seller's pockets. The buyer has told that tale with the requisite particularity, and the contract permits the buyer to sue on the seller's alleged fraud. But the buyer has failed to plead the seller's affiliate misappropriated any trade secrets, resulting in dismissal of that claim.

## I.    BACKGROUND[4]

Plaintiff Harbor Compliance Corp. ("Harbor" or "Buyer") provides software for company compliance solutions. Plaintiff Labyrinth, Inc. ("Labyrinth" or the "Company," and together with Harbor, "Plaintiffs") provides charity, fundraiser, corporate, "and other similar registration services" through its company software to "nonprofit and for-profit entities."[5]    Defendant Stephen Urich ("Stephen" or

---

[4] For the purposes of the pending motion to dismiss for failure to state a claim, I draw the following facts from the plaintiffs' Verified Complaint, as well as the documents attached and integral to it. *See, e.g.*, *H-M Wexford v. Encorp*, 832 A.2d 129, 139 (Del. Ch. May 27, 2003). Citations in the form "Compl." refer to plaintiffs' Verified Complaint, available at docket item ("D.I.") 1. Citations in the form "DOB" refer to Defendants' Opening Brief in Support of Partial Motion to Dismiss the Verified Complaint, available at D.I. 19. Citations in the form "PAB" refer to Plaintiffs' Answering Brief in Opposition to Defendants' Partial Motion to Dismiss, available at D.I. 25. Citations in the form "DRB" refer to Defendants' Reply Brief in Support of their Partial Motion to Dismiss the Verified Complaint, available at D.I. 28.

[5] D.I. 1 at Ex. A [hereinafter "SPA"] § 1.2 (defining "Business").

"Seller") was the Company's CEO and sole stockholder.[6] Defendant Robert Urich, Stephen's father, served as the Company's treasurer.

### A. Harbor And Stephen Begin Negotiations.

On March 19, 2021, Harbor approached Stephen about potentially collaborating with, merging with, or acquiring the Company. Seven months of negotiations culminated in the execution of an October 2021 Stock Purchase Agreement (the "SPA"). Stephen, Robert, Harbor, and the Company all signed the SPA.

When negotiations began, Seller asked for as much as $42 to $45 million, but Harbor refused to offer more than $28 million.[7] "Soon after negotiations began," Robert started drafting a series of Company financials to share with Buyer.[8] Stephen instructed Robert to "let [him] know at such point as [Robert] feel[s] [he] ha[s] a version that is pretty solid and shows Labyrinth in about as good a light as possible."[9] On May 5, Stephen emailed Robert "regarding the estimate for [2021]" and directed him to "work from [$9,300,000]," because Stephen "told [Harbor] previously that

---

[6] Compl. ¶ 21. Given the common surname of both defendants, I use first names in pursuit of clarity. I intend no familiarity or disrespect.

[7] *Id.* ¶¶ 25–27.

[8] *Id.* ¶ 135.

[9] *Id.* ¶ 136.

[he] was estimating $9,300,000 for [2021]."[10]  The same day, Stephen represented to Harbor that the Company "expected an annual revenue for 2021 of $9,300,000 and 28.6% growth over 2020."[11]  By May 12, Stephen made "a series of specific representations [to Harbor] about the Company's past practices, present financial state, and future growth representations."[12]  Then, on May 12, Harbor presented an initial letter of intent (the "LOI") for Seller's consideration.[13]  On June 7, after some due diligence, Harbor and Seller executed the LOI which included price terms.[14]

## B.  Stephen Begins Accelerating Billing.

The next day, June 8, Stephen asked an accountant for "the best way to get the money out [of the Company]"[15] before the sale.  To date, Labyrinth had generally billed only once work was complete.[16]  But that day, Stephen instructed the Company's director of accounting to instead bill clients "for work that had not been completed."[17]  On June 9, Stephen instructed employees to pre-bill existing clients

---

[10] *Id.* ¶ 137.

[11] *Id.* ¶ 22.

[12] *Id.*

[13] *Id.* ¶ 200.

[14] *Id.* ¶¶ 140, 157.

[15] *Id.* ¶ 135.

[16] *Id.* ¶¶ 35, 41.

[17] *Id.* ¶¶ 159–60.

5

for work that had not started.[18]  On June 14, Stephen instructed employees to pre-bill new clients.[19]  On June 16, Stephen called for invoicing clients "even when the Company did not have adequate information to begin work."[20]

Stephen kept it up.  In July, he instructed the Company to bill clients "who . . . have never been billed" and to bill "any new clients that [Labyrinth was] eventually going to do work for (i.e. most of them)."[21]  In August, Stephen emphasized he wanted the Company "to bill all new clients, even if they have not been assigned to a[] [Company agent] yet" and that he "would like to get in as much money as possible in the next 45 days."[22]  "By the end of September, Stephen was offering overtime incentives for employees to work on the [new] Invoice Acceleration" policy; the "overtime wages . . . would be paid not by Seller, but by Buyer on behalf of the Company post-Closing."[23]

Meanwhile, Seller represented to Buyer that "at least 40% of the Company's yearly revenue was concentrated in the fourth-quarter (October through December)," with at least $3.3 million in collections during the fourth quarter of 2021.[24]  Buyer

---

[18] *Id.* ¶ 165.

[19] *Id.* ¶ 166.

[20] *Id.* ¶ 167.

[21] *Id.* ¶ 171.

[22] *Id.* ¶ 173.

[23] *Id.* ¶ 192.

[24] *Id.* ¶ 30.

did not know Seller had changed the Company's billing practices, and financed the purchase with a loan from Canadian Imperial Bank of Commerce ("CIBC") that had a large payment due in December. Harbor insisted the transaction close by October 1 to capture the Company's fourth-quarter revenue. On August 19, Buyer emailed Seller and reiterated its reliance on fourth-quarter revenue for making its initial loan payments. Seller responded on August 27, reiterating his projected growth rate and telling Buyer he saw "no reason . . . not to expect the same this year."[25] Without referencing current billing practices, Seller reiterated its historic practice of "bill[ing] once a year for . . . services after [Company] ha[s] done all the filings. Most will pay this year."[26] On August 31, Seller assured Buyer that "nothing is due upfront" for Company clients.[27]

On September 14, Seller informed Buyer that the Company would be collecting a "high level of billings, combined with anticipated future expected billings" and attached a fourth-quarter collections spreadsheet projecting substantial accounts receivable and $3,301,865 in revenue for October through December.[28]

---

[25] *Id.* ¶¶ 32–33.

[26] *Id.* ¶ 34.

[27] *Id.* ¶ 35.

[28] *Id.* ¶¶ 39–40.

Buyer did not know Seller had accelerated billing and that much of the projected fourth-quarter earnings had already been collected.[29]

## C. Harbor Becomes Concerned.

On September 15, the day after Stephen gave Harbor high fourth-quarter projections and less than a month before closing, Seller notified Buyer that "the Company revised [its] collection practices and [that] in September it invoiced a large number of its clients for completed work."[30]  Buyer immediately recognized that "changes to accelerate invoicing could significantly shrink the amount of revenue and profits" expected between October and December.[31]

On September 16, Buyer asked Seller "what actions . . . [he had] taken regarding the change to [the Company] billing model," whether he had communicated that change to employees or clients, and to send Buyer any of those communications.[32]  Seller replied that (1) "there ha[d] not been formal communication" to the clients because the changes were small, (2) "the invoicing changes would impact only a small percentage of its clients," (3) "only one member

---

[29] *See id.* ¶ 216 ("The Invoice Acceleration Scheme therefore had the related effect of falsely including in the Company's accounts receivable purported 'revenues' from work that had not yet been complete or, in many instances, had even been started for the Company's clients.  These practices drastically and materially altered the Company's internal accounting and other recordkeeping policies and procedures.").

[30] *Id.* ¶ 43 (quoting SPA Scheds. 4.6(n) and 4.20(b)).

[31] *Id.* ¶ 46.

[32] *Id.* ¶ 51.

of the Company's accounting team . . . was actively following up on open invoices," and (4) the Company did not bill all of its new clients.[33]

The conversation continued over the next several days, with Buyer showing concern over the disclosed change in billing and Seller trying to boost Buyer's flagging confidence.[34] On September 19, Stephen asked his father to share Company expense sheets and to "manipulate the numbers as [he] need[ed]."[35] Robert responded to his son the same day with an attached "Budget 2022."[36]

On September 21, Buyer forwarded proposed edits to representations and warranties in the SPA inspired by the disclosed changes to Seller's billing practices.[37] Seller did not respond. On September 24, Buyer emailed Seller again, explaining, "if we go into next week with open negotiation items, it's just not going to be possible to close by 10/1. I'll reiterate that we're not buying your business after that date, so if you're interested in selling, please let me know today . . . ."[38] On September 24, "Seller's counsel rejected the document and noted that Seller's last draft of the SPA was 'our best and final offer.'"[39] Separately, Seller emailed

---

[33] *Id.* ¶¶ 52, 54.

[34] *Id.* ¶¶ 55–58.

[35] *Id.* ¶ 150.

[36] *Id.*

[37] *Id.* ¶ 59.

[38] *Id.* ¶ 61.

[39] *Id.* ¶ 62.

Buyer reassuring Buyer that Seller "intended to collect '$3 million in profits over the next 3 months.'"[40]

On September 29, Buyer again sought additional contractual representations as to the Company's financials and billing practices, and Seller again refused: "I like the existing wording – it seems pretty standard to me as a CPA. There is no fraud, you are getting a good company, but at this point, I don't want to reopen parts of the agreement that were negotiated."[41] Buyer insisted it understood Seller's "side was okay with [Buyer's] changes to the financials section absent a call to make any necessary clarifications or discuss."[42] Seller simply repeated "[w]e are not changing the wording at this point . . . . There is no fraud or deception on our side."[43] Two hours later, Buyer asked Seller how much revenue the Company anticipated from October 1 through December 31; minutes later, Seller responded repeating the $3 million figure.[44]

That evening, Buyer's counsel sent another revised SPA to Seller, seeking a representation as to Seller's projected revenue stream for the rest of 2021.[45] The

---

[40] *Id.* ¶ 64.

[41] *Id.* ¶ 68.

[42] *Id.* ¶ 69.

[43] *Id.* ¶ 70.

[44] *Id.* ¶ 71; *see id.* ¶¶ 39, 64–65.

[45] *Id.* ¶ 73.

next day, Buyer sent its own email to Seller, again stressing Harbor's "struggle with running the projections for the next year," as "the change to the billing practice . . . left [Harbor] wondering how much revenue will be left for [it], if any."[46] Seller quickly reassured Buyer there would be "plenty of revenue,"[47] and again rejected a change to the SPA. The night before the SPA closed, Seller "forwarded a schedule . . . to Harbor Compliance showing the Company had approximately $1,652,000 in accounts receivable through the end of September that it expected to collect on or before December 31, 2021."[48]

### D. The Transaction Closes.

On October 1, the SPA closed. Stephen agreed to a broad noncompete provision in the SPA.[49] The transaction also included Stephen and Robert's consulting agreements, the loan and security agreement with CIBC, and a subordinated promissory note between Buyer and Seller.

An interim balance sheet (the "Interim Balance Sheet") covering January 1, 2021 through August 31, 2021 was appended to the SPA in Schedule 4.4 with other

---

[46] *Id.* ¶ 75.

[47] *Id.* ¶ 76.

[48] *Id.* ¶ 78.

[49] *Id.* ¶¶ 261, 299–300; SPA § 6.7.2.

Company financial statements (collectively, the "Financial Statements").[50] It indicated Labyrinth earned $4,609,850 in income in just eight months.[51] The Interim Balance Sheet, like the projections Stephen had provided in September, included three months' worth of radically accelerated billing. Seller did not disclose this. Instead, the SPA indicated the opposite: Section 4.4(a) represented "[t]here has been no intentional fraud, intentional misrepresentation, or intentional misconduct in connection with the preparation of the Financial Statements;"[52] and Section 4.20(b) represented "[e]xcept as set forth on Schedule 4.20(b), since December 31, 2020, the Company has not (i) collected its Accounts Receivable other than in the Ordinary Course of Business; or (ii) accelerated or otherwise altered its collection practices."[53]

Seller consistently represented to Buyer that in the ordinary course of business, "nothing [was] due upfront"[54] and "at least 40% of the Company's yearly revenue . . . concentrated in the fourth quarter (October through December)."[55] In that context, the Interim Balance Sheet's total revenue communicated the

---

[50] D.I. 49, Ex. "Complete Disclosure Schedules to the Stock Purchase Agreement" at Schedule 4.4 [hereinafter "SPA Sched. 4.4"].

[51] SPA Sched. 4.4 at "Labyrinth Financial Statement August 31, 2021."

[52] *Id.* § 4.4(a).

[53] *Id.* § 4.20(b); *see id.* § 1.2 (defining "Ordinary Course of Business" as "the ordinary course of business of the Business, and of the Company in connection with the Business, consistent with the Company's past practice and custom").

[54] Compl. ¶ 35.

[55] *Id.* ¶ 30.

expectation that the Company would receive at least $3,073,233 in fourth-quarter revenue.[56]

In the end, with the revenue from Labyrinth's accelerated invoicing, Stephen took a $977,930 dividend and Robert received a $190,000 bonus.[57] "[T]he Company had effectively a closing cash balance of $211,029.72."[58] And the fourth quarter only yielded $900,000 in profits and $2 million in revenues.[59] As a result, Buyer and the Company (together, "Plaintiffs") defaulted on the CIBC loan. Buyer did not know Seller had accelerated invoicing starting in June, and could not reconcile the distance between Seller's financial representations and the Company's financial reality.[60]

### E. Harbor Leases California Office Space From Stephen.

As part of the SPA, Buyer entered into two long-term lease agreements for rental properties that Seller owns or controls. The SPA's Schedule 4.7(b) disclosed

---

[56] Working backwards from the Interim Balance Sheet's total revenue, $4,609,850 is 60% of $7,683,083.33, and $3,073,233.33 is 40% of that. *See* SPA Sched. 4.4 at "Labyrinth Financial Statement August 31, 2021."

[57] Compl. ¶¶ 194–95 (alleging Stephen "paid himself approximately $885,000, $645,000 of which was paid on September 24, just one week prior to closing"); *see* SPA Sched. 4.6 (representing Stephen took a $977,930 dividend).

[58] Compl. ¶ 196.

[59] *Id.* ¶¶ 93, 94.

[60] *Id.* ¶ 103.

these two properties were owned by Stephen, leased by the Company, and "used for operating business."[61]

In negotiations, Stephen had represented to Buyer that Labyrinth's workforce preferred to work in the office. In May 2021, Stephen had "issued a mandatory, Company-wide, exception-free policy requiring all employees to work from the California offices and not from home."[62] On June 8, the day after signing the LOI, Seller asked an outside accountant if, among other options, "the best way to get the money out" of the Company was through "rent on [his] buildings."[63] By July 2, at least one Company senior employee had "expressed displeasure with the in-office policy."[64] On July 13, Seller represented to Buyer that the Company made working from home or the office "optional for about 1 year" and that "most (although not all) employees chose to work at the office 5 days a week."[65]

Buyer then asked Seller to "issue a staff survey to gauge the employees' desire to work in-office, versus continuing to work remotely."[66] Seller created the survey, appended a cover letter to it, and skewed answers in favor of the in-office policy.[67]

---

[61] SPA Sched. 4.7(b)1–2.

[62] Compl. ¶ 200.

[63] *Id.* ¶ 135.

[64] *Id.* ¶ 209.

[65] *Id.* ¶ 91.

[66] *Id.* ¶ 205.

[67] *Id.* ¶ 206.

14

Stephen shared the results with Harbor, noting that "only a couple of inefficient, undesirable employees" expressed a preference for not returning to the office.[68] Harbor determined that employee in-office preferences demonstrated the Company's "need to enter into the Leases"[69] and executed them with the SPA. Sometime after the SPA closed, Buyer discovered "that a majority of the Company's workforce objected to the mandatory in-person attendance policy."[70]

### F. Stephen And Robert Try To Erase Their Tracks, But Are Found Out; Stephen Launches Completely Compliant.

Stephen and Robert remained with the Company as consultants until the end of 2021. Upon termination of their consulting agreements, Defendants wiped and returned their Company devices. But the Company successfully recovered some of that deleted data.[71] Plaintiffs discovered from the recovered data that between October 4 and December 27, 2021, Defendants exported sensitive corporate data[72]

---

[68] *Id.* ¶ 207.

[69] *Id.* ¶ 204.

[70] *Id.* ¶ 228; *see id.* ¶ 201.

[71] *Id.* ¶¶ 107–08.

[72] *Id.* ¶ 111 ("[1] October 4, Stephen . . . tr[ied] to export his emails to an additional unknown device . . . . [2] October 25, Stephen emailed himself (to a personal email address) a spreadsheet of the Company's customers, including contact names, phone numbers and addresses . . . . [3] November 16, Stephen emailed himself (to a personal email address) a 'Labyrinth Monthly Management Meeting' document, containing strategy and operational details for the Company . . . . [4] December 3, Stephen emailed himself . . . a listing of open invoices . . . . [5] December 26, Stephen emailed himself . . . copies of the Company's Balance Sheet and Profit and Loss Statement . . . . [6] December 27, Robert

and actively worked to ensure Buyer would never see certain communications, despite Buyer's directive to Stephen and Robert that Labyrinth "not lose any emails or files."[73]  And, for the first time, Buyer discovered the Company's accelerated invoicing had begun in June, not September.[74]

On October 14, 2022, Buyer notified Seller and Robert of its claim for indemnification.[75]  On November 11, Seller refused to indemnify Buyer.[76]

Seller created Completely Compliant, LLC ("Completely Compliant" or the "Competing Business") on December 1, 2022.[77]  Completely Compliant's website went live in February 2023.[78]  It "offers the same services as those of the Company and the Buyer," and markets to the same clientele, in the same territory.[79]  Plaintiffs sent Stephen a demand letter regarding his competitive activities on February 27.[80] On March 6, "Stephen's counsel confirmed his role in the Competing Business by

---

provided Stephen with several Company financial spreadsheets, [and] Stephen emailed them to himself.").

[73] *Id.* ¶ 113.  *But see id.* ¶ 114 (indicating that Stephen and Robert used a Labyrinth employee to ensure "[Labyrinth] had 0 access to [e]mail").

[74] *Id.* ¶¶ 104, 118–19, 122–26.

[75] *Id.* ¶ 257; *see* D.I. 1, Ex. C.

[76] Compl. ¶ 259; *see* D.I. 1, Ex. D.

[77] Compl. ¶ 290.

[78] *Id.* ¶ 293.

[79] *Id.* ¶ 294.

[80] *Id.* ¶ 301.

refusing to deny his involvement" and further claimed "that [either] his actions were excused or . . . the [SPA] restrictive covenants were not enforceable."[81]

### G. Litigation Ensues.

Plaintiffs filed their Verified Complaint for Injunctive and Other Relief against Stephen, Robert, and Completely Compliant on March 16, 2023.[82] The Complaint includes nine counts: Count I, for breach of restrictive covenants against Stephen; Count II, for breach of Stephen's consulting agreement with Harbor (the "Consulting Agreement"); Count III, for misappropriation of trade secrets against Stephen and Completely Compliant; Count IV, for fraud against Stephen; Count V, for conspiracy to commit fraud against Robert; Count VI, for breach of Article IV of the SPA against Stephen; Count VII, for breach of Article VI of the SPA against Stephen and Robert; Count VIII, for indemnification against Stephen; and Count IX, for declaratory judgment as to Harbor's set-off right against Stephen.[83]

On May 12, Stephen filed his Answer and Counterclaims, and Defendants filed their Partial Motion to Dismiss the Verified Complaint (the "Motion").[84] Defendants' Motion addressed all nine counts, leaving only Count VII against

---

[81] *Id.* ¶ 303.

[82] D.I. 1.

[83] Compl. ¶¶ 309–99.

[84] D.I. 18, 19.

Stephen untouched.[85]  Harbor moved for dismissal of Stephen's counterclaims,[86] which I denied on August 18.[87]  I heard oral argument on Defendants' Motion on August 22.[88]

Given the breadth of the issues generated by the Motion's clash with the Complaint, and the press of time in the parties' stipulated expedited schedule, on November 19 I asked the parties to identify their top three issues for the Motion.[89] The parties helpfully submitted their joint letter on November 27.[90]  Plaintiffs ask me to address (1) whether the Court has personal jurisdiction over Completely Compliant, (2) whether Robert remains a party to this action, and (3) whether the Complaint states a valid claim for misappropriation of trade secrets.[91]  Defendants ask me to address (1) whether Stephen's noncompete provision in the SPA is enforceable, (2) whether injunctive relief is barred by the SPA's exclusive remedies

---

[85] DOB 16–60.

[86] D.I. 24.

[87] D.I. 50; *see* D.I. 52.

[88] D.I. 59 [hereinafter "Hr'g Tr."].

[89] D.I. 77.

[90] D.I. 79.

[91] *Id.* at 1–2.

provision, and (3) whether Plaintiffs stated a claim for fraud.[92] I shared brief responses with the parties on January 3, 2024.[93] My explanations follow.

## II. ANALYSIS

For the most part, Delaware has lenient pleading standards on a motion to dismiss for failure to state a claim.[94] I must accept as true all well-pled "factual allegations in the Complaint, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant[s] notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff[s]."[95] Dismissal is not appropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[96] The test for surviving a motion to dismiss is conceivability, not future evidentiary impossibility.[97]

---

[92] *Id.* at 2–3.

[93] D.I. 107.

[94] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 132 (Del. Ch. Apr. 30, 2004). Defendants also challenge this Court's exercise of jurisdiction over Completely Compliant under Court of Chancery Rule 12(b)(2). This argument only applies to Count III and is addressed in connection with that count. *See infra* Section II.E.1.

[95] *Cent. Mort. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[96] *Id.*

[97] *Id.* at 536 ("[I]t may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."); *see also id.* at 537 n.13 ("Our governing 'conceivability' standard is more akin to 'possibility' . . . ." (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009)).

For the reasons that follow, I deny Defendants' motion as to Counts IV, V and VII: Plaintiffs have told a detailed tale of fraud and conspiracy against Stephen and Robert. I also hold the SPA is reasonably interpreted to permit the injunctive relief Plaintiffs seek. As to Stephen's restrictive covenant, it is overbroad, but the unique circumstances of this action, in which he personally negotiated that covenant and may have held the upper hand in negotiations, might warrant blue penciling it. I dismiss Plaintiffs' claim for misappropriation of trade secrets against Completely Compliant for failure to state a claim, thereby dismissing Completely Compliant from the case, and against Stephen as it relates to Harbor's trade secrets. I defer my disposition on the merits of Counts I, II, III as to Stephen's misappropriation of Labyrinth trade secrets, VI, VIII, and IX until trial in March.[98]

### A.    Harbor Stated A Claim For Fraud Against Stephen.

Harbor alleges "Seller made numerous false representations and omissions of fact concerning the Company's finances, books and records, and other key Company information."[99] Harbor identifies two types of false representations: contractual

---

[98] *See* Ct. Ch. R. 12(a)(1); *see also id.* 12(d); *Spencer v. Malik*, 2021 WL 719862, at *5 (Del. Ch. Feb. 23, 2021) ("A party does not have a right to a pleading-stage ruling."); *Slingshot Techs., LLC v. Acacia Rsch. Corp.*, 2021 WL 1224828, at *3 (Del. Ch. Mar. 30, 2021) ("Under Rule 12(a)(1), a court may postpone the disposition of a pleading stage motion until a later stage of the case, including until the trial on the merits. Rule 12(d) reiterates this point, noting that a court should address a Rule 12(b)(6) motion in a preliminary hearing unless the court orders that the hearing and determination thereof be deferred until the trial." (alterations omitted) (internal quotation marks omitted)).

[99] Compl. ¶ 343.

representations and extra-contractual communications. Seller argues Harbor's fraud claim must be dismissed because it is barred by SPA anti-reliance language, it fails to plead fraud with particularity, fails to establish Seller's knowing culpability, and fails to show Harbor justifiably relied on Stephen's representations during negotiations of the SPA. None of those arguments prevail.

To state a claim for fraud, Harbor must plead facts that allege the following elements:

> (1) a false representation, usually one of fact, made by defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[100]

Court of Chancery Rule 9(b) imposes a heightened standard for pleading aspects of a fraud claim.[101] It requires that "[i]n all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity. [But,] [m]alice, intent, knowledge, and other conditions of mind of a person may be averred generally."[102]

---

[100] *In re P3 Health Grp. Hldgs.*, 2022 WL 15035833, at *3 (Del. Ch. Oct. 26, 2022).

[101] *See State ex rel. Brady v. Publ'rs Clearing House*, 787 A.2d 111, 115 (Del. Ch. Apr. 19, 2001) (explaining the pleading standard for fraud "is an exception to the liberal 'notice pleading' standard applicable to most pleadings under the Rule 8"); *see also* Ct. Ch. R. 9(b).

[102] Ct. Ch. R. 9(b).

### 1. Harbor Alleges False Representations With Particularity.

"To plead fraud, a plaintiff must identify a false representation."[103] Identifying a false representation requires Buyer to allege "with specificity what . . . statements were materially false and why they were false."[104] This "particularity" standard "generally calls upon plaintiffs to frame their allegations using the newspaper-story format by alleging '(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations.'"[105] In other words, "an allegation of fraud is legally sufficient . . . if it informs defendants of the precise transactions at issue, and the fraud alleged to have occurred in those transactions, so as to place defendants on notice of the precise misconduct with which they are charged."[106]

---

[103] *Prairie Cap. III, L.P. v. Double E Hldg., Corp.*, 132 A.3d 35, 49 (Del. Ch. Nov. 24, 2015).

[104] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1051 (Del. Ch. Feb. 14, 2006).

[105] *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *12 (Del. Ch. Feb. 28, 2020) (quoting *Abry P'rs*, 891 A.2d at 1050).

[106] *P3 Health Grp. Hldgs.*, 2022 WL 15035833, at *4 (quoting *Kahn Bros. & Co., Inc. Profit Sharing Plan & Tr. v. Fischbach Corp.*, 1989 WL 109406, at *4 (Del. Ch. Sept. 19, 1989)); *Abry P'rs*, 891 A.2d at 1050 ("[T]he plaintiff is required to allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim.").

### a.  Contractual Representations[107]

Where plaintiff alleges contractual misrepresentations, "it is relatively easy to plead a particularized claim of fraud."[108]  "An allegation of fraud is legally sufficient . . . if it informs defendants of the precise transactions at issue, and the fraud alleged to have occurred in those transactions, so as to place defendants on notice of the precise misconduct with which they are charged."[109]  Buyer has placed Seller on notice of the contractual representations underpinning a claim for fraud related to accelerated billing, but failed to identify any false contractual representation related to the California leases.

### i.  Accelerated Billing

The alleged contractual misrepresentations relating to Stephen's accelerated billing involve four SPA sections and three associated schedules.[110]  First, Buyer

---

[107] Seller contends Buyer's fraud claims based on contractual representations constitute impermissible bootstrapping and are merely repackaged breach of contract claims.  But, the bootstrap rule does not apply where, as here, plaintiff seeks a remedy for fraud based in recission or rescissory damages.  *Anschutz Corp. v. Brown Robin Cap.*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020).  The plaintiff/buyer may also plead a fraud claim next to a breach of contract claim if he can plead "either:  (1) that the Seller knew that the Company's contractual representations and warranties were false; or (2) that the Seller itself lied to the Buyer about a contractual representation and warranty."  *Abry P'rs*, 891 A.2d at 1064.  Buyer has done both.

[108] *Roma Landmark Theaters v. Cohen Exhibition Co.*, 2020 WL 5816759, at *11 (Del. Ch. Sept. 30, 2020) (citing *Prairie Cap.*, 132 A.3d at 62).

[109] *P3 Health Grp. Hldgs.*, 2022 WL 15035833, at *4.

[110] *See* PAB 15–16 (citing SPA §§ 4.4, 4.6, 4.7, and 4.20; *id.* at Scheds. 4.6(n), 4.7(b), and 4.20(b)).

alleges Section 4.4, which promises the Financial Statements were prepared in accordance with sound accounting principles and without any intentional fraud or misrepresentation, was false because the Financial Statements reflected revenue from work that had not yet been completed or even begun.[111]

Next, Buyer alleges Section 4.6 and Schedule 4.6(n), and Section 4.20 and Schedule 4.20(b), were false when made. Section 4.6 states, as elided by Plaintiff, that

> Since the Interim Balance Sheet Date, and except as set forth on Schedule 4.6 of the Disclosure Schedules, the Company has not . . . (a) suffered a Material Adverse Effect; . . . (f) made any change in its accounting methods; . . . (n) conducted the Business outside of the Ordinary Course of Business; . . . [or] (p) entered into any agreement to do any of the foregoing.[112]

Section 4.20 represented that the Company had not "collected its Accounts Receivable other than in the Ordinary Course of Business; or . . . accelerated or

---

[111] Compl. ¶ 215 (quoting SPA § 4.4 ("The Financial Statements have been prepared in accordance with cash basis and sound accounting principles applied on a consistent basis throughout the period involved, fairly present on a cash basis the financial condition of the Company as of the respective dates they were prepared and the results of operations for the periods indicated. The Company maintains and, for all periods covered by the Financial Statements has maintained, in accordance with applicable accounting standards, financial books and records which accurately and fairly reflect the transactions of the Company. The Financial Statements are consistent with the financial books and records of the Company. The Company maintains a standard system of accounting established and administered in accordance with sound, cash basis accounting principles consistently applied. There has been no intentional fraud, intentional misrepresentation or intentional misconduct in connection with the preparation of the Financial Statements or to the Knowledge of Seller any allegation made to the Company of the foregoing.")); *id.* ¶ 216.

[112] *Id.* ¶ 218 (quoting SPA § 4.6).

otherwise altered its collection practices," and that "all of the Company's accounts receivable have arisen from bona fide transactions and represent . . . sales made in the Ordinary Course of Business."[113]   As exceptions to those representations, Schedules 4.6(n) and 4.20(b) state:

> The Company revised its collection practices and in September it invoiced a large number of its clients for completed work as of the date of these invoices and planned to send two additional invoices for the Company's fee this year to these clients, as opposed to the sending just one for the Company's fees a year which was more common in past years.  The Company tasked an accounting team member to follow up on past due invoices as opposed to past years when it just sent the invoice monthly.  The Company also billed some fees for new clients in advance to mitigate risk – the Company had not usually billed new clients in advance in recent years.  The Company currently recognizes revenue for registered agents once the following steps have occurred: (i) the Company has ordered and paid for the registered agent, and (ii) the Company has received a payment from a client.  In prior years, it would not recognize revenue until all checks for that client had cleared and cleared checks could be balanced out by a payment, meaning it sometimes took years to recognize this revenue.  Other than the change in invoice dates, all other collection practices remain in place and are consistent with past practice.[114]

Buyer claims these statements were false when made because Seller concealed the accelerated billing scheme and its effects, and included in accounts receivable revenues that were not collected or generated in the ordinary course of business.[115]   Buyer alleges "the [i]nvoice [a]cceleration [s]cheme was a massive

---

[113] SPA §§ 4.20(a), (b).

[114] SPA Sched. 4.6(n); *id.* at Sched. 4.20(b).

[115] Compl. ¶¶ 219–20.

25

departure" from Company past practices that had far-reaching consequences.[116] Buyer also contends Seller deliberately concealed (1) the "accounts receivable . . . had not arisen from bona fide transactions with clients," (2) the Company collected "all accounts receivable attributable to the invoice acceleration scheme . . . outside of the ordinary course of business," and (3) the "vast and significant departures from the Company's historic collection practices."[117]

Seller argues Buyer's claim must fail because "the invoicing changes were expressly disclosed" and nothing in the complaint identified that "the SPA was rendered false by the invoicing changes . . . or how the disclosures were false."[118] In particular, Seller points to the disclosures in Schedules 4.6(n) and 4.20(b) that "[t]he Company revised its collection practices and in September it invoiced a large number of its clients for completed work."[119]

---

[116] Id.

[117] Id. ¶ 223.

[118] DOB 8–9. Seller's brief did not engage with the particularity or falsity of Buyer's fraud allegations based on Section 4.4. Any argument that those representations were not identified as false has been waived. Emerald P'rs v. Berlin, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). At oral argument, Seller framed Buyer's Section 4.4 claim as asserting that the Company failed to comply with GAAP, and defended that claim by arguing Section 4.4 did not mention GAAP and so could not be false. Hr'g Tr. 26, 109–10. Seller missed Buyer's point. Buyer claims Seller's "Invoice Acceleration Scheme" "had the related effect of falsely including in the Company's accounts receivable purported 'revenues' from work that had not yet been complete or . . . had even been started for the Company's clients." Compl. ¶ 216. Seller has failed to dislodge this claim at the pleading stage.

[119] SPA Sched. 4.20(b).

Seller argued these disclosures of September revisions are not false on a standalone basis and leave room for revisions in other months.[120]

But Seller promised that there were no revisions in other months. He explicitly disclosed that "all other collection practices remain in place and are consistent with past practice" and that "[e]xcept as set forth on Schedule 4.20(b), since December 31, 2020, the Company has not (i) collected its Accounts Receivable other than in the Ordinary Course of Business; or (ii) accelerated or otherwise altered its collection practices."[121] Those statements were false for months other than September.

The disclosures of revisions to collection practices only in September for completed work were also themselves misleading. They mention invoicing for completed work and "some fees for new clients" only in September.[122] When coupled with Section 4.20(b)'s promise that no other collection practices had changed, the disclosure of changes for September misleadingly convey that the Company did not revise its collection practices in other months or in other ways. An otherwise truthful but "incomplete statement can amount to fraud when a party 'purports to tell the whole truth' but fails to 'disclose the additional information

---

[120] Hr'g Tr. 14.

[121] SPA § 4.20(b); *see id.* at Sched. 4.6(n), 4.20(b).

[122] *Id.* at Sched. 4.20(b).

27

necessary to prevent the statement from misleading the recipient."[123]   Disclosing

limited deviations from the Company's ordinary collection practices, while

promising no other deviations occurred, gave the misleading impression that no

other deviations occurred.  It follows that the failure to disclose other months of

accelerated billing, and billing for work that was not completed or even begun, was

misleading.[124]

Buyer has fairly identified false representations within the SPA pertaining to

accelerated billing.

### ii.  Leases

Buyer also complains Seller fraudulently yoked Buyer with long-term rental

obligations to Seller with a false representation in the SPA that "the California

offices were necessary for operating the Company's business."[125]  But Buyer builds

this claim out of circumstantial evidence and not the plain language of the SPA.

Buyer points out that Seller owns or controls two Company rental properties;[126] he

asked an accountant if "rent on [his] buildings" would be the best way to "get the

---

[123] *NetApp, Inc.*, 2023 WL 4925910, at *13 (quoting Restatement (Second) of Torts § 551 cmt. g. (1977)).

[124] SPA Scheds. 4.6(n) and 4.20(b).

[125] Compl. ¶ 228.

[126] *Id.* ¶¶ 5, 89; *see* SPA Sched. 4.7(b)(1)–(2) ("Leased from CCSD, LLC, which is owned by Seller . . . . Leased from Thibodo, LLC, which is owned by Seller.").

money out [of the Company];"[127] he knew employees did not like working in the office; and the SPA disclosures indicated the office spaces were "used for operating business."[128] Buyer later discovered that "neither of the California offices were necessary for operating the Company's business."[129]

Buyer concludes these facts support the inference that Seller falsely represented in Section 4.7(b) and Schedule 4.7(b) of the SPA that Labyrinth needed the California office space.[130] Not so. Section 4.7(b) states:

> Schedule 4.7(b) Disclosure Schedules lists (i) the street address of each parcel of Real Property; (ii) if such property is leased or subleased by the Company, the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease for each leased or subleased property; and (iii) the current use of such property.[131]

It merely articulates that Schedule 4.7(b) details, among other things, "the current use of [the leased] propert[ies]."[132] Nothing in Section 4.7(b) is false.

Buyer's argument focuses on Schedule 4.7(b)'s statements that Seller owns two of the three properties, and that all three properties are "used for operating

---

[127] Compl. ¶¶ 134–35.

[128] *Id.* ¶ 227; *see* SPA Sched. 4.7(b)(1)–(3).

[129] Compl. ¶ 228.

[130] *Id.* ¶¶ 226–29, 354.

[131] SPA § 4.7(b).

[132] *Id.*

29

business."[133]   Buyer argues the phrase "used for operating business"[134] (the "Property Use Representation") implied that "the California Offices were necessary for operating the Company's business."[135]

But the SPA does not say, or imply, that the California offices were necessary. Neither Section 4.7(b) nor its schedule conveys the Company needed to lease office space, let alone that it needed to lease Stephen's office space. Nothing suggests a future need for the space. Rather, the Property Use Representation pertains to the leased properties' "current use." Buyer has not otherwise established that the Property Use Representation was false.

### b. Extracontractual Representations

In addition to contractual fraud, Harbor also asserts extracontractual fraud. "In order to state a claim of common law fraud," the plaintiff must allege with the requisite particularity that the "defendant either 1) represented false statements as true, 2) actively concealed facts which prevented [the plaintiff] from discovering them, or 3) remained silent in the face of a duty to speak."[136] Harbor has fairly apprised Stephen of all but one of its fraud claims by identifying the time, place, and

---

[133] *Id.* at Sched. 4.7(b)1–3.

[134] *Id.*

[135] Compl. ¶ 228.

[136] *Metro Commc'n Corp.*, 854 A.2d at 143 (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d at 1074).

contents of allegedly false and misleading extracontractual statements Stephen made during SPA negotiations.

It is tempting to simply redirect readers to the background section of this opinion, which relays Buyer's detailed allegations of Seller's fraud. I will highlight a few examples. Seller allegedly falsely "represented that the key financial performance metrics—fourth-quarter collections, profits, and accounts receivable— were all unaffected by Seller's collection practices disclosures."[137] Buyer identifies with particularity Seller's representations that both the key financial metrics and the collection practices were holding steady. Buyer provides dates and quotations from Stephen's emails to Buyer regarding Company financial metrics and growth rates.[138] Buyer pled that as late as September 29, and in the days before, Seller represented to Buyer that the Company would make $3 million in revenue and profits for October through December.[139] "Seller represented . . . $3,000,000 in profits during the

---

[137] Compl. ¶ 80.

[138] *See id.* ¶ 30 (regarding Seller's representations that 40% of yearly revenue received by the Company was consistently concentrated in the fourth quarter); *see also id.* ¶¶ 32–34 (relaying Seller's August 27 email that represented Company's May 2021 average growth rate disclosure and informed Buyer he saw "no reason . . . not to expect the same this year" and indicating Seller made no reference to the Company's current billing practices but reiterated its historic practice of "bill[ing] once a year for . . . services after [Company] ha[s] done all the filings").

[139] *See id.* ¶ 39 (alleging on September 14, Seller sent a spreadsheet to Buyer "representing at least $3,301,865 in collections during the fourth quarter of 2021"); *see also id.* ¶¶ 64–65 (alleging on September 24, Seller assured Harbor the Company should "collect $3,000,000 in profits over the next 3 months); *id.* ¶ 71 (alleging on September 29, Seller reiterated that he "expect[ed] around $3,000,000 in additional accounts receivable the next 3 months").

fourth-quarter of 2021 [but] there was only $900,000;"[140] Seller represented $3 million for fourth-quarter revenues, but they only amounted to $2 million.[141]

As for the Company's accelerated billing practices, Buyer details that Seller initiated Company's accelerated collection practices in June.[142] Buyer identifies Seller's August emails representing to Buyer (1) the Company's continued practice of billing only once per year for completed services and (2) that "nothing is due upfront" for its clients.[143] Buyer also identifies Seller's September statements downplaying the invoicing changes and promising that the changes would not affect working capital, estimated receivables, or fourth-quarter profits.[144] Buyer adequately pleads Seller made false or misleading extracontractual statements.

But Harbor fails to allege Stephen fraudulently induced it to enter long-term California office space lease agreements. Buyer's allegations that Seller represented a Company need for the California rental space to accommodate employees who wanted to work in the office comprise one paragraph:

---

[140] *Id.* ¶ 93.

[141] *Id.* ¶ 94.

[142] *Id.* ¶¶ 159–60, 165–66, 167, 171, 173, 192.

[143] *Id.* ¶¶ 34–35.

[144] *Id.* ¶¶ 52–55, 58, 64, 72, 76.

> At various times during negotiations, Seller represented to Buyer that the Company's California-based employees preferred working in the California Offices, as opposed to teleworking, and that because of this desire, it would be necessary for the Company to lease the California Offices for the Company's operations following the Transaction.[145]

Buyer alleges these general representations were false and identifies who made them.[146] In the next paragraph, Buyer alleges with particularity when Seller represented the staff wanted to work in the office.[147] But, "beyond generally alleging that such statements were made during the [seven-month-long] negotiations," Buyer does not allege when Seller made any statement that it was necessary to lease the California offices.[148] This generalized allegation fails to provide the level of detail Rule 9(b) requires.[149] Buyer never alleges with particularity when Seller said the staff in-office preference necessitated the Company (1) currently use the California

---

[145] *Id.* ¶ 90.

[146] *See id.* ¶¶ 102, 198–210.

[147] *Id.* ¶ 91 ("Seller made additional representations regarding the working preferences of Company employees on July 13, 2021, when he told [Harbor], '[w]e had a work from home process available to all staff for about 15 months and it was mandatory for a few of those months . . . . [Presently] most employees seemed to prefer the office . . . most (although not all) employees chose to work at the office 5 days a week.'").

[148] *Malt Fam. Trust v. 777 P'rs LLC*, 2023 WL 7476966, at *5 (Del. Ch. Nov. 13, 2023).

[149] *See MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *9 n.120 (Del. Ch. May 10, 2018) ("Federal courts applying the analogous Federal Rule of Civil Procedure 9(b) have held that alleging a time frame of six or more months is insufficient to satisfy the particularity requirement."); *see also Hatteras Enters. Inc. v. Forsythe Cosmetic Grp., Ltd.*, 2018 WL 1935984, at *11 (E.D. N.Y. 2018) ("[I]t is insufficient to state that the misrepresentations occurred over a six to seven month period." (collecting cases)); *McCann v. Jupina*, 2017 WL 1540719, at *2 (N.D. Cal. 2017) ("[C]ourts have held that a nine-month window is not sufficiently narrow to satisfy Rule 9(b)." (collecting cases)).

offices for business operations and (2) continue to use them after the SPA. Buyer fails to state the circumstances constituting fraud with particularity.

Buyer's claim for fraud based on extracontractual representations that the Company needed the California offices is dismissed. Having determined Harbor pled the accelerated billing fraud with particularity, I next address Seller's argument that those allegations fail to satisfy fraud's scienter and justifiable reliance elements. The allegations are sufficient.

## 2. Harbor Sufficiently Pleads Scienter.

Seller argues Buyer failed to plead, as it must, that "the alleged misrepresentations 'were known to be false when made.'"[150] Seller argues that Buyer "concludes with no facts that Stephen knew the invoicing changes rendered the corresponding disclosures and representations in the SPA false."[151] As to the representations of the Company's future performance and growth, Seller also argues Buyer failed to plead with particularity that Stephen knew or believed those representations were false when he made them.[152] Seller argues the revenue stream and profit projections he offered to Buyer in a series of emails between May and

---

[150] DRB 9 (quoting *Stein v. Wind Energy Hldgs., Inc.*, 2022 WL 17590862, at *7 (Del. Super. Dec. 13, 2022)).

[151] *Id.* 10.

[152] DOB 40.

September were mere forward-looking estimates, and that the truth was not knowable, so they could not support a fraud claim.[153]

After identifying false representations, the plaintiff must allege facts showing a "certain level of scienter on the part of the defendant; a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth."[154] Because "any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable," Rule 9(b) only requires the claim "allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it."[155]

The uncertain nature of a future projection does not excuse a knowingly false projection, where it is reasonably conceivable that Seller made the false projection with an intent to deceive Buyer.[156] Future uncertainty "does not mean [a seller]

---

[153] *See id.* 37; *see also Edinburgh Hldgs. v. Educ. Affiliates*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018); *Knight Broadband LLC v. Knight*, 2022 WL 1788855, at *11 (Del. Super. June 2, 2022).

[154] *Metro Commc'n Corp.*, 854 A.2d at 143.

[155] *Abry P'rs*, 891 A.2d at 1050.

[156] *See Phage Diagnostics v. Corvium*, 2020 WL 1816192, at *7–8 (Del. Super. Mar. 9, 2020); *see also Clark v. Davenport*, 2019 WL 3230928, at *12 (Del. Ch. Jul. 18, 2019) ("[W]hen a party makes false statements with an intent to deceive, that party may be liable for fraud regardless of whether the statements expressed opinions, estimates, or projections of the future.").

35

could say anything he want[s]."[157] False forward-looking statements survive a motion to dismiss where it is reasonably conceivable that a seller's prediction "was a known falsehood, and . . . [it] was designed to further mislead."[158] False forecasts "cannot be considered mere puffery or future predictions if they were made with an intent to deceive, even if the statements were presented as opinions, estimates or projections."[159]

Buyer alleges sufficient facts to support a reasonable inference Seller intended to deceive Buyer into overpaying, and to obscure Seller's acceleration of the Company's revenues that would otherwise be due after closing and extraction of

---

[157] *Clark*, 2019 WL 3230928, at *12. Seller cites *Edinburgh Holdings v. Education Affiliates* to support his contention that his future profitability representations were "not knowable" at the time they were made. 2018 WL 2727542, at *12; *see* DOB 36. There, the sellers' future profitability figures represented what "[the] business unit could achieve in the following four years." *Edinburgh*, 2018 WL 2727542, at *12. After concluding that future revenue over four years "was not knowable at the time [the company] made the representations," the Court acknowledged that forward-looking representations were still actionable if the seller knew them to be false. *Id.*; *see Clark*, 2019 WL 3230928, at *12. The statements in *Edinburgh* failed to state a claim because the buyer's allegation that "the seller knew the statements were false when made" was conclusory and "legally insufficient to support a fraudulent inducement claim." 2018 WL 2727542, at *12. *Edinburgh* does not foreclose reliance on future predictions. *Id.* (asserting that "[i]n limited circumstances, . . . a promise of future conduct can be actionable in fraud if the plaintiff 'plead[s] specific facts that lead to a reasonable inference that the promisor had no intention of performing at the time the promise was made'" (quoting *Hopkins v. Concorde Career Colls., Inc.*, 2016 WL 1238775, at *3 (D. Del. 2016)).

[158] *Phage Diagnostics*, 2020 WL 1816192, at *7.

[159] *Id.*; *accord Clark*, 2019 WL 3230928, at *12 (holding "expressed opinions, estimates, or projections of the future" are not insulated from fraud when a party makes them with the knowledge they were false and with an intent to deceive).

36

those revenues as a pre-closing dividend.[160] The day after the LOI was signed, Seller began investigating how to extract cash from the Company before selling it[161] and then initiated and expanded the Company's accelerated billing practices until closing.[162] In the midst of his accelerated invoicing campaign, Seller emailed Buyer that the Company "typically (though not always) bill[s] once a year for . . . services after we have done all the filings" and that "nothing is due up front" for its clients.[163] As Seller was milking the Company for cash by accelerating invoicing, he was knowingly misrepresenting that invoicing remained consistent with past practices. He promised the same in the SPA itself.

Another exchange is particularly telling. After Seller disclosed the changes to September's invoicing, Buyer proposed SPA language to firm up the Company's billing practices. In so doing, Buyer apprised Seller of Buyer's expectation that "[e]xcept as set forth on Schedule 4.20(b), since December 31, 2020, the Company has not . . . (iii) changed any payment terms for any of its Clients in [a] manner inconsistent with past practices."[164] Seller never dashed Buyer's hopes on this point;

---

[160] Compl. ¶ 121.

[161] *See id.* ¶¶ 135, 159.

[162] *Id.* ¶¶ 159–60.

[163] *Id.* ¶¶ 34–35.

[164] *Id.* ¶ 60 (Harbor suggesting that Section 4.20(b) contain a new addition); *id.* ¶ 62 (alleging Stephen rejected that addition); *see* SPA § 4.20(b) ("(b) Except as set forth on Schedule 4.20(b), since December 31, 2020, the Company has not (i) collected its Accounts

instead, he offered more assurances that the Company would meet revenue targets and downplayed the scheme's impact.[165]

As to the fourth-quarter estimates, Buyer alleges with supporting facts that Seller presented them with the requisite intent to deceive.[166] Seller knew Buyer depended on the Company achieving those estimates to make its loan payments.[167] On September 13, Seller told Robert he had "no idea' how much revenue would be received by the end of 2021 [and that] . . . [he] assume[d] for cash it should be close to zero."[168] Yet on September 14, Seller provided Buyer a fourth-quarter collections spreadsheet projecting $3,301,865 in revenue.[169] The next day, Seller partially disclosed to Buyer the Company's accelerated billing practices;[170] when Buyer

---

Receivable other than in the Ordinary Course of Business; or (ii) accelerated or otherwise altered its collection practices.").

[165] Compl. ¶¶ 57, 63.

[166] *Clark*, 2019 WL 3230928, at *12–13 (The plaintiff alleged (1) the company "faced a financial crisis," (2) the CEO "had exhausted other options," (3) the company "desperately needed to obtain a cash infusion," and that (4) the CEO "had significant financial and reputational stake in keeping [the company] solvent" and the company "was his sole source of income . . . .").

[167] *See* Compl. ¶ 31 (quoting an August 19 email from Buyer reiterating its reliance on the fourth-quarter billing revenue for making initial loan payments); *see also id.* ¶ 75 (quoting a September 30 email from Buyer voicing concern that "the change to the billing practice . . . left [Harbor] wondering how much revenue will be left for [it], if any").

[168] *Id.* ¶ 148.

[169] *Id.* ¶¶ 39–40.

[170] *Compare id.* ¶¶ 42–43 *with id.* ¶ 165.

38

sought assurance that the September 14 spreadsheet remained unaffected,[171] Seller emailed Robert, instructing him to "send over expense sheets" and to "[m]anipulate the numbers as . . . need[ed]."[172] Days before closing and the start of the fourth-quarter, and one day after Buyer voiced its continued concerns about the fourth quarter in light of the September billing acceleration disclosure,[173] Seller again forecasted the Company's fourth-quarter accounts receivable at the consistent $3 million figure.[174] Buyer proposed adding representations as to Seller's fourth-quarter profits and revenue projections;[175] Seller rejected the edits, then emailed Buyer, "[t]he last 3 months is a very significant amount of the total work that we do for the year and is our busy season . . . . There is plenty of revenue left for you."[176] Seller provided the fourth-quarter projections in the midst of his accelerated billing scheme, then stood by them even as contemporaneous documents reveal he knew they were gutted by his own actions.

Buyer has met its burden to plead scienter, both generally and as to the forward-looking projections Seller provided.

---

[171] *Id.* ¶¶ 51, 55–58.

[172] *Id.* ¶ 150.

[173] *Id.* ¶¶ 67–72.

[174] *Id.* ¶¶ 71, 72; *see id.* ¶¶ 39, 64–65.

[175] *Id.* ¶ 74.

[176] *Id.* ¶ 76.

### 3.  Harbor Justifiably Relied On Stephen's Representations.

Seller argues Buyer fails the element of reliance for its extracontractual fraud claims because the SPA contains anti-reliance language.[177]  It does not.

Once a court finds the "plaintiff has adequately pled . . . knowledge and . . . fraudulent misrepresentations . . . , the rest of the elements of the claim for fraud are easily satisfied."[178]  To adequately plead justifiable reliance, the plaintiff must show it is reasonably conceivable "that his 'action' was 'taken in justifiable reliance upon the representation."[179]  This "is a contextual inquiry and 'is judged by reference to the plaintiff's knowledge and experience.'"[180]  Thus, "whether a party's reliance was reasonable is not generally suitable for resolution on a motion to dismiss,"[181]  except for the legal conclusion that reliance was not reasonable because of a fully integrated contract's "explicit anti-reliance representation."[182]

---

[177] DOB 31–34.

[178] *EMSI Acq. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *16 (Del. Ch. May 3, 2017).

[179] *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *23 (Del. Ch. Mar. 9, 2022).

[180] *Id.* (quoting 37 C.J.S. Fraud § 51 (Feb. 2022 Update)).

[181] *TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726, at *7 (Del. Ch. Sept. 25, 2015).

[182] *Id.* (quoting *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010)).

Although Delaware "honor[s] clauses in which contracted parties have disclaimed reliance on extra-contractual representations,"[183] the contract "must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."[184] "[M]urky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations."[185] And "a disclaimer by the selling company of what it was and was not representing and warranting" does not relieve a defendant from extra-contractual fraudulent representations.[186] "[C]ontractual provisions cannot preclude reasonable reliance unless they constitute, when taken together, a clear promise by the plaintiffs that they were relying only on the representations in the contract itself and were not relying on any statement outside the four corners of the agreement."[187] Neither is present in the SPA.

---

[183] *Abry P'rs*, 891 A.2d at 1056.

[184] *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. May 19, 2004).

[185] *Abry P'rs*, 891 A.2d at 1059.

[186] *FdG Logistics v. A&R Logistics Hldgs*, 131 A.3d 842, 860 (Del. Ch. Feb. 23, 2016).

[187] *Kronenberg*, 872 A.2d at 575 (declaring Delaware "is chary about permitting contracts to bar fraud claims, [thus] contractual provisions cannot preclude reasonable reliance unless they constitute, when taken together, a clear promise by the plaintiffs that they were relying only on the representations in the contract itself and were not relying on any statement outside the four corners of the agreement" and holding a provision is not an anti-

Seller points to Section 9.3, but that provision is a standard integration clause.[188]  A standard integration clause "does not operate as a bar to fraud claims, but rather simply . . . limit[s] the scope of the parties' contractual obligations to those set forth in the written agreement."[189]

---

reliance clause if it cannot be unambiguously read to "constitute an affirmative contractual agreement that the parties to the underlying contract were not relying on any extra-contractual statements of fact in deciding to contract"); *see Advisor Invs., LLC v. Powell*, 2023 WL 6383242, at * 5 (Del. Ch. Sept. 29, 2023) ("Delaware courts have been clear . . . that an aggrieved buyer must clearly and unambiguously disclaim on extra-contractual representations to bar fraud claims.  To be effective . . . such [anti-reliance] provisions must identify the specific information on which a party has relied and which foreclose reliance on other information.").

[188] SPA § 9.3 ("The agreement of the parties that is comprised of this Agreement sets forth the entire agreement and understanding among the parties with respect to the subject matter hereof and supersedes any and all prior agreements, understandings, negotiations and communications, whether oral or written, relating to the subject matter of this Agreement. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, any Exhibit and the Disclosure Schedules (other than an exception expressly set forth in the Disclosure Schedules), the statements in the body of this Agreement will control.").

[189] *Kronenberg*, 872 A.2d at 592.

Seller also points to Section 4.28,[190] but that provision amounts to Seller's disclaimer "of what it was and was not representing and warranting."[191] Both Section 9.3 and Section 4.28 lack an "affirmative expression by Buyer of (1) specifically what it was relying on when it decided to enter the Merger Agreement or (2) that it is was not relying on any representations made outside of the Merger Agreement."[192]

Seller also points to Section 5.7 and urges the Court to read it together with Sections 4.28 and 9.3 to "define the universe of information that the Plaintiffs relied upon."[193] Section 5.7 reads:

---

[190] SPA § 4.28 ("Except for the representations and warranties contained in Section 3 and this Section 4 (including the related portions of the Disclosure Schedules), none of Seller, the Company or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or the Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Company furnished or made available to Buyer and its Representatives or any information, documents or material made available to Buyer in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Company, or any representation or warranty arising from statute or otherwise in law.").

[191] *FdG Logistics*, 131 A.3d at 860.

[192] *Id.*

[193] DOB 33; *see Reault v. Halma Hldgs. Inc.*, 2023 WL 8005318, at *10 (D. Del. 2023) ("[O]n occasion Delaware courts have read exclusive representation clauses and integration clauses together to find that they have the effect of an anti-reliance clause.").

43

Independent Investigation: Buyer has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose. Buyer acknowledges and agrees that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, none of Seller, the Company or any other Person has made any representation or warranty as to Seller, the Company or this Agreement, except as expressly set forth in Sections 3 and 4 of this Agreement (including the related portions of the Disclosure Schedules).[194]

Seller would have me invert Section 5.7's structure, beginning with the last clause and concluding with the first.[195] But "structure and relationship of the parts of a contract reveal the drafters' intent."[196] I read Section 5.7 in the order in which it was drafted.

Seller properly understands the first clause affirms that Harbor "conducted its own independent investigation . . . and acknowledges that [Harbor] has been provided adequate access' to the Company in deciding to enter the SPA."[197] Further, the phrase "conducted its own independent investigation, review, and

---

[194] SPA § 5.7.

[195] DRB 4 ("First, Section 5.7 disclaims . . . any representations outside of the SPA . . . . Harbor then affirms that it 'conducted its own independent investigation' and again 'acknowledges that it has been provided adequate access' to the Company in deciding to enter the SPA.").

[196] *JJS, LTD. v. Steelpoint Hldgs.*, 2019 WL 5092896, at *6 (Del. Ch. Oct. 11, 2019).

[197] SPA § 5.7; DRB 4.

44

analysis"[198] implies Buyer formed a judgment or opinion of "the business, results of operations, prospects, condition (financial or otherwise), or assets of the Company" from what Seller provided, namely "the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose."[199] Section 5.7's first sentence details all the information that formed Buyer's own independent analysis of the company, including the extracontractual information Seller provided.[200] In *Anschutz Corporation v. Brown Robin Capital*, this Court explained such a provision "does not communicate any anti-reliance commitment."[201] Instead of disclaiming extra-contractual reliance, this type of

---

[198] *See Analysis*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/ english/analysis (last visited Jan. 16, 2024) ("[T]he act of studying or examining something in detail, in order to discover or understand more about it, or your opinion and judgment after doing this: 'I was interested in Clare's analysis of the situation' . . . . Someone's opinion, based on the knowledge and information they have, of what a situation is and what it means.").

[199] SPA § 5.7.

[200] *Id.* ("[I]t has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller and the Company for such purpose.").

[201] *Anschutz Corp.*, 2020 WL 3096744, at *14 (discussing a provision where "Buyer acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, has formed an independent judgment concerning, the Company and its business and operations, and that it has been provided with such information about the Company and its business and operations as it has requested").

"clause reasonably can be read to reflect that Buyer was expressly representing it *did*

*rely* on extra-contractual information."[202]

Having permitted, or even established, reliance, Section 5.7 goes on:

Buyer acknowledges and agrees that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, none of Seller, the Company or any other Person has made any representation or warranty as to Seller, the Company or this Agreement, except as expressly set forth in Sections 3 and 4 of this Agreement (including the related portions of the Disclosure Schedules).[203]

This clause identifies Seller's representations.  The question is whether it precludes Buyer's reasonable reliance on representations that are not identified.  For guidance, I look to cases discussing other provisions in which the buyer referred to the seller's representations: *Prairie Capital*, in which the provision identified "the universe of information on which the contracting parties relied,"[204] and *Anschutz,* in which it did not.

---

[202] *Id.* (citing *Prairie Cap.*, 132 A.3d at 50) (distinguishing the clause from one in which the buyer stated it was relying on the results of its own investigation and the sellers' representations).

[203] SPA § 5.7.

[204] *Prairie Cap.*, 132 A.3d at 51.

In *Prairie Capital*, the buyer represented the following:

> The Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the financial condition, operations, assets, liabilities and properties of the [Seller]. In making its determination to proceed with the Transaction, the Buyer has relied on (a) the results of its own independent investigation and (b) the representations and warranties of the [Seller] expressly and specifically set forth in this Agreement, including the Schedules. SUCH REPRESENTATIONS AND WARRANTIES BY THE [SELLER] CONSTITUTE THE SOLE AND EXCLUSIVE REPRESENTATIONS AND WARRANTIES OF THE [SELLER] TO THE BUYER IN CONNECTION WITH THE TRANSACTION, AND THE BUYER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT ALL OTHER REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO, ANY RELATING TO THE FUTURE OR HISTORICAL FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS OR LIABILITIES OR PROSPECTS OF DOUBLE E AND THE SUBSIDIARIES) ARE SPECIFICALLY DISCLAIMED BY THE [SELLER].[205]

This provision "represents affirmatively that the Buyer only relied on the representations and warranties in the SPA," thereby "establish[ing] the universe of information on which that party relied," and, together with an integration clause, "add[ed] up to a clear anti-reliance clause."[206]

By contrast, the provision in *Anschutz* identified the representations and warranties made by the seller, but it lacked a representation by the buyer "that it 'understands, acknowledges, and agrees' that the seller was disclaiming

---

[205] *Id.* at 50.

[206] *Id.* at 51.

extra-contractual representations."[207]  "Buyer made no . . . promise in the UPA not to rely on extra-contractual representations, warranties or statements."[208]

Section 5.7 lacks that promise as well.  Buyer did not affirmatively acknowledge any disclaimer by Seller, or otherwise specifically establish the universe of information on which Buyer did or did not rely.  The first sentence of Section 5.7 explained Buyer was relying on extracontractual information Seller furnished, and the second sentence does not disclaim reliance on any extracontractual information.  Like the *Anschutz* seller, Stephen has offered a standard integration clause, an independent investigation clause, and a representation and warranty clause.[209]  Like the *Anschutz* provisions, "[w]hat is notably absent from these provisions is any disclaimer of reliance by Buyer."[210]

From there, Buyer's allegations demonstrate reasonable reliance.  In the world beyond anti-reliance clauses, reasonable reliance is a fact-intensive inquiry.[211]  For

---

[207] *Anschutz Corp.*, 2020 WL 3096744, at *14.

[208] *Id.*

[209] *See id.* ("[Seller Insiders] point to three provisions they claim, in total, amount to unambiguous anti-reliance language.").

[210] *Id.*

[211] *Arwood*, 2022 WL 705841, at *23 (citing *Trascent Mgmt. Consulting v. Bouri*, 2018 WL 4293359, at *17 (Del. Ch. Sept. 10, 2018); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *33 (Del. Ch. Dec. 3, 2018) ("Whether reliance is justifiable is an objective standard."); 37 Am Jur. 2d Fraud and Deceit § 239 (Feb. 2022 Update) ("[T]he question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties.")).

contractual misrepresentations, "reasonable reliance . . . [is] easily met . . . because the false statements at issue are contained in a written agreement. Specifically, it is reasonable to infer that the Defendants wanted [plaintiff] to rely on the representations because they are found in the Contribution Agreement."[212] For extra-contractual misrepresentations, this Court has considered the nature of the parties' relationship, extent of negotiations, length of time in preparing the agreement, and repetition of the malefactor's assurances as indicative of reasonable reliance.[213] "A plaintiff's diligence efforts can be evidence that her reliance on a false representation was reasonable because she made efforts to verify the representation and discovered no reason to doubt its truth."[214]

Here, Buyer alleges sufficient facts to indicate it reasonably relied on Seller's contractual and extra-contractual misrepresentations. Buyer conducted its "own

---

[212] *LVI Grp. Inv., LLC v. NCM Grp. Hldgs., LLC*, 2018 WL 1559936, at *13 n.198 (Del. Ch. Mar. 28, 2018).

[213] *Grunstein v. Silva*, 2009 WL 4698541, at *12 (Del. Ch. Dec. 8, 2009) (holding the Complaint facially alleged sufficient facts to survive a motion to dismiss when it alleged a preexisting relationship between the parties, the collective work between them in crafting the agreement, the year-long duration until it was finished, defendant employed plaintiff after the agreement closed, and defendant's repeated assertions of the parties' shared interest in the deal).

[214] *Arwood*, 2022 WL 705841, at *24 (quoting *Great Hill Equity P'rs*, 2018 WL 6311829, at *33); *see also Great Hill Equity P'rs*, 2018 WL 6311829, at *33 ("The fact that a plaintiff's diligence efforts do not uncover fraud does not render such efforts unreasonable, especially when the fraud was intentionally hidden.").

investigation,"[215] and "commissioned a quality of earnings report" to come up with its own EBITDA figure.[216] Buyer made efforts to verify Seller's collections representations and to elicit more specific contractual representations, which Seller obstructed.[217] Buyer's "failure to uncover the fraud during its due diligence review was not unreasonable, as the fraud was [allegedly] . . . hidden from [Buyer] when its due diligence team went looking."[218] As in *Grunstein v. Silva*, several factors support reasonable reliance: Buyer and Seller collectively drafted the SPA;[219] Seller consistently and repeatedly offered facts and Company data to support his

---

[215] SPA § 5.7.

[216] Compl. ¶ 26.

[217] *See* Compl. ¶ 141 (quoting an email between Stephen and Robert indicating Harbor "want[ed] to know about the last payroll in 2020 that normally would have been paid in 2021 and other items which might increase EBITDA and want[ed] back up and details for them" and showing Stephen's intent to provide Buyer with manipulated data: "We want to give them info that that will make it look like EBITDA is high"); *id.* ¶ 51 (quoting Buyer's email to Seller following the September collections practice disclosure, with Buyer asking: "what actions have you taken regarding the change to your billing model? Have you communicated that change to employees or clients? If so, please send me those communications and the number of clients you sent them to"); *id.* ¶ 189 ("Buyer emailed [Stephen] to better understand what percentage of clients were subject to the Collection Practices Disclosure, and [Stephen] responded that he was not sure which clients were, but he promised that it was only a small number."); *id.* ¶ 71 (quoting an email from Buyer to Seller: "[h]ow much [accounts receivable] would you anticipate we would have from 10/1 through 12/31 that is not counted in your balance sheet? I'm asking about revenue we would capture").

[218] *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007).

[219] *See, e.g.*, Compl. ¶ 68.

misrepresentations;[220] and Seller and Robert continued to work for Buyer after the SPA closed.[221]   Further, Seller wielded his professional training as an accountant to buttress his misrepresentations.[222]  And so, on the facts as pled, it is reasonably conceivable "that [Buyer's] 'action' was 'taken in justifiable reliance upon"[223] Seller's contractual representations, and "it would be improper to dismiss reliance-based claims at this stage."[224]

## B.     Robert Urich Remains A Party To The Action.

Robert is named as a defendant in Counts V and VII only.  Defendants moved to dismiss Count V, for conspiracy to commit fraud, in its entirety, and Count VII's breach of contract claim against Robert.  Plaintiffs asked me to address whether Robert remains a party to this action.[225]  He does.

### 1.    Harbor Stated A Claim For Conspiracy To Commit Fraud.

"A conspiracy to commit fraud is not an independent cause of action.  It must be predicated on an underlying wrong:  fraud."[226]  Thus, courts first address the fraud allegations to determine whether plaintiff stated a claim for fraud, "then consider

---

[220] *See, e.g.*, *id.* ¶¶ 51–79.

[221] *See, e.g.* D.I. 1, Ex. B [hereinafter "Consulting Agreement"].

[222] Compl. ¶ 68 ("I like the existing wording—it seems pretty standard to me as a CPA.").

[223] *Arwood*, 2022 WL 705841, at *23.

[224] *Grunstein*, 2009 WL 4698541, at *12.

[225] D.I. 79 at 2.

[226] *Boulden v. Albiorix*, 2013 WL 396254, at *8 (Del. Ch. Jan. 31, 2013).

51

[the] conspiracy to commit fraud claim."[227]  As explained, Harbor stated a claim for fraud.

A conspiracy "occurs when there is: '(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage.'"[228]  "With respect to the first element, '[e]ven to prevail at trial the [plaintiff does] not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirator[s].'"[229] To survive a motion to dismiss, a plaintiff need only plead "sufficient facts to support an inference that [Defendants] . . . acted in concert' with one another."[230]  A complaint showing an alleged conspirator providing "substantial assistance" and working closely with the other defendant, infers an awareness of fraud and "states a claim for civil conspiracy."[231]  But, this Court has also found facts pleading a significant "relationship" with the other defendants will satisfy "a fair inference of [the alleged conspirator's] complicity in concerted misconduct."[232]

---

[227] *Id.*

[228] *In re Am. Intern. Gp.*, 965 A.2d 763, 805 (Del. Ch. Feb. 10, 2009) (quoting *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149–50 (Del. 1987)).

[229] *Agspring Holdco v. NGP X US Hldgs.*, 2020 WL 4355555, at *21 (Del. Ch. July 30, 2020).

[230] *Id.* (quoting *Prairie Cap.*, 132 A.3d at 64); *see Am. Intern*, 965 A.2d at 806.

[231] *Agspring*, 2020 WL 4355555, at *21.

[232] *Am. Intern.*, 965 A.2d at 806.

Harbor pleads facts sufficient to support an inference that Robert and Stephen acted in concert in the alleged financial misrepresentations. Robert is Stephen's father and the Company's former treasurer.[233] As early as May 6, 2021, in "the very beginning of negotiations with Buyer, Stephen wrote to Robert, asking how best to funnel cash from the Company for his personal use."[234] That same month, Seller instructed Robert to cast Company financials in "as good a light as possible" for sending to Harbor.[235] He later told Robert to start not from the objective Company financials but from $9,300,000, the previous 2021 revenue estimate previously given to Harbor.[236] When Buyer questioned the Company's high EBITDA, Stephen instructed his father, "[w]e want to give them info that that will make it look like EBITDA is high."[237] Seller told Robert the effect of his accelerated invoicing scheme: he told him he had "no idea' how much revenue would be received by the

---

[233] *See, e.g.* Compl. ¶ 7.

[234] *Id.* ¶ 127.

[235] *Id.* ¶ 136.

[236] *Id.* ¶ 137 ("I told them previously that I was estimating $9,300,000 for this year based on sales . . . so I guess that is the number to work from.").

[237] *Id.* ¶ 141 ("They want to know about the last payroll in 2020 that normally would have been paid in 2021 and other items which might increase EBITDA and want back up and details for them. The Vista print was an overcharge that we used later in 2021. The IP Switch Phone is probably the phone system we bought for the new locations and said it was a one-time item. We want to give them info that that will make it look like EBITDA is high.").

end of 2021 [and that] . . . [he] assume[d] for cash it should be close to zero."[238] And weeks before closing, Seller directly asked Robert to "[m]anipulate the numbers as [he] need[ed] to" on the expense sheets for Seller to provide to Harbor.[239]

Robert benefitted from the accelerated invoicing scheme: he received a $190,000 bonus.[240] He also, alongside Stephen, secured a consulting agreement through December 31, 2022 with Buyer.[241] After the SPA closed, Robert "conspired to delete Company email and other valuable data," had his computer wiped, and provided Stephen with several company financial spreadsheets.[242] The Complaint pleads Robert provided substantial assistance to Seller and worked closely with him, inferring an awareness of fraud and stating a claim for conspiracy to commit fraud.

Robert argues Count V should be dismissed because its damages duplicate Count IV's.[243] As explained "in *Garfield v. Allen*, seeking dismissal of duplicative claims is 'a throwback to common law pleading.'"[244] At the pleadings stage, "there

---

[238] *Id.* ¶ 148.

[239] *Id.* ¶ 150.

[240] *Id.* at Sched. 4.6(c).

[241] *See* Compl. ¶ 128 (stating the goal of "a guaranteed employment at a reasonable rate").

[242] *Id.* ¶¶ 111–17.

[243] DOB 47 ("[S]eparate damages' must still be 'specifically ascribed to the alleged conspiracy' and cannot be duplicative of other asserted damages in a complaint." (quoting *AmeriMark Interactive, LLC v. AmeriMark Hldgs., LLC*, 2022 WL 16642020, at *12–13 (Del. Super. Nov. 3, 2022)).

[244] *Malt Fam. Tr.*, 2023 WL 7476966, at *10 (quoting *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 360 (Del. Ch. 2022)).

is little utility" in dismissing a fraud or civil conspiracy claim for redundancy.[245]  At this stage, I will not dismiss a claim for conspiracy because its damages might be coterminous with those from the underlying fraud.  Robert remains a defendant in Count V.

### 2. Plaintiffs' Claim For Breach Of The SPA Against Robert Is Not Dismissed.

Having answered in the affirmative that Robert remains a defendant, I will make quick work of his argument for dismissal of Count VII, for breach of the SPA. Plaintiffs allege Robert breached Sections 6.7.2 and 6.7.5.  Both of these sections expressly prohibit "Seller and Robert Urich" from engaging in specific post-closing conduct.[246]  As his only defense, Robert argues Plaintiffs fail to show the breach of a contractual obligation:  Robert's SPA signature block only binds him to Section 7.5 and Article 9, and it "fails to include the sections of the SPA alleged to have been breached in Count VII."[247]  What's more, one section the signature block references "does not exist"[248]—there is no Section 7.5 in the SPA.

---

[245] *Great Hill Equity P'rs*, 2014 WL 6703980, at *22; *see Swipe Acq. Corp. v. Krauss*, 2020 WL 5015863, at *8 (Del. Ch. Aug. 25, 2020) ("Whether to dismiss a claim as duplicative is within the discretion of the Court.").

[246] SPA §§ 6.7.2, 6.7.5.

[247] DOB 53.

[248] *Id.*

Of course, to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must allege "the breach of an obligation imposed by that contract, and the resultant damage."[249] Where interpretations over the meaning or application of an express contract differ, dismissal is proper only if the defendant's interpretation is the only reasonable construction as a matter of law.[250] Courts must avoid interpretations that lead to absurd consequences[251] and "prefer an interpretation which gives a reasonable, lawful, and effective meaning to all manifestations of intention, rather than one which leaves a part of those manifestations unreasonable or unlawful."[252] Where a contract is ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions"[253] and should not truncate the proceeding without gathering sufficient evidence.[254]

---

[249] *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *19 (Del. Ch. Oct. 10, 2022).

[250] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003).

[251] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

[252] 11 Richard A. Lord, Williston on Contracts § 32:11 (4th ed.).

[253] *GMG Cap. Invs. v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 780 (Del. 2012).

[254] *Eagle Indus. v. DeVilbiss Health Care*, 702 A.2d 1228, 1232–33 (Del. 1997) (holding the Court of Chancery erroneously dismissed a breach of contract claim when the relevant provision was ambiguous, and erroneously truncated the proceeding without adequate evidence to ascertain intent).

Robert does not attempt to identify what the parties intended when Robert agreed to be bound to Section 7.5, and it would be absurd to conclude the parties intended Robert be bound to a nonexistent section while simultaneously rescinding Robert's obligations to a section expressly addressing him. Perhaps the parties meant Section 7.5 to be Section 6.7.5; perhaps the parties intended something entirely different. The ambiguity, while perhaps so minor as to be a typo, requires a greater factual inquiry to determine the parties' intent.[255] It is here that I refrain from charging "forward" with the "Light Brigade."[256]

Plaintiffs have adequately alleged the existence of a contract and obligations applicable to Robert under that contract. Robert did not raise any other defense against Count VII. I defer analysis of Robert's breach of the SPA for trial.

---

[255] The signature block is not susceptible to reformation on these pleadings, where Plaintiffs did not plead mistake. Scrivener's error is a subset of mistake. "A scrivener's error is a mutual mistake where a modified term is included simply by a drafter's mistake." *Bryant v. Way*, 2012 WL 1415529, at *12 (Del. Super. Apr. 17, 2012). That scrivener's error derives from mistake is relevant, as a party must plead with particularity a claim seeking reformation. *See Duff v. Innovative Discovery LLC*, 2012 WL 6096586, at *10 (Del. Ch. Dec. 7, 2012) ("In order to gain reformation, the party seeking such form of relief must plead with particularity the ingredients on which it is based, namely mutual mistake or fraud, Rule 9(b).").

[256] Alfred Tennyson, *The Charge of the Light Brigade, in* The Charge of the Light Brigade and Other Poems 52 (2016).

### C. A Reasonable Interpretation Of The SPA Indicates It Permits Injunctive Relief Under Section 10.12.

Buyer seeks to enjoin Seller from violating contractual obligations under Counts II and III.[257] Seller argues that relief is unavailable because "the SPA includes an exclusive remedies and general release provision precluding any injunctive relief sought in the Complaint."[258] Seller's argument relies on another typo, which I cannot credit, fix, or otherwise act on at this stage.

Section 9.12 of the SPA permits specific enforcement. It reads in full:

> Each of the parties acknowledges and agrees that the other parties would be damaged irreparably in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached or violated. Accordingly, each of the parties covenants and agrees that, without posting bond or similar undertaking, *each of the other parties shall be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to the remedy of specific performance of this Agreement and the terms and provisions hereof* in any action, suit or proceeding instituted in any court as specified in Section 9.8 having jurisdiction over the parties and the subject matter, in addition to any other remedy to which such party may be entitled, at law or in equity. Each party further covenants and agrees that, in the event of any action, suit or proceeding for specific performance in respect of such breach or violation, it shall not assert that a remedy at law would be adequate.[259]

While one might expect the SPA's Exclusive Remedies provision to carve out Section 9.12, it repeatedly contemplates an exception under Section 10.12 instead:

---

[257] Compl. ¶¶ 323, 337–40.

[258] DOB 22.

[259] SPA § 9.12 (emphasis added).

*Subject to Section 10.12*, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Section 8. In furtherance of the foregoing*, except with respect to Section 10.12, each party hereby waives, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement* it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Section 8. *Nothing in this Section 8.9 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Section 10.12.*[260]

Plaintiffs contend "there was an entire section deleted at some point;" accepting that premise would permit the reasonable interpretation that the parties intended to permit specific performance.[261] I am inclined to agree with Plaintiffs, but the error precludes me from doing so today. I will not yet say the SPA precludes injunctive relief, but without greater factual confidence, neither will I say the SPA permits it. The availability of specific performance will be determined after trial.

### D. Unique Circumstances Preclude Dismissal Of Count I.

Plaintiffs allege Stephen violated the restrictive covenants expressed in Section 6.7.2 of the SPA. First, Stephen argues Harbor's prior material breach of

---

[260] *Id.* § 8.9 (emphasis added).

[261] Hr'g Tr. 86.

the SPA renders the restrictive covenants unenforceable.[262]  This argument fails at this stage because Buyer has pled that Seller breached the SPA at closing by making fraudulent misrepresentations.  Second, Seller contends the restrictive covenants are unreasonable.  This is a good argument.

"When parties have ordered their affairs voluntarily through a binding contract, Delaware . . . [courts] respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract."[263]  "Courts scrutinize carefully all contracts limiting a man's natural right to follow any trade or profession anywhere he pleases and in any lawful manner."[264]  "While Delaware may 'frown[ ] on' or disfavor restrictive covenants, our law nonetheless recognizes their validity."[265] Thus, Delaware does not "mechanically" enforce or deny noncompetes[266] but

---

[262] *See* DOB 17; *see also Physiotherapy Corp. v. Moncure*, 2018 WL 1256492, at *5 (Del. Ch. Mar. 12, 2018) (prior material breach excused compliance with non-compete provision); *L & W Ins., Inc.  v. Harrington*, 2007 WL 2753006, at *7, 11 (Del. Ch. Mar. 12, 2007) (holding a prior material breach precluded any finding of reasonable success for injunction).

[263] *ev3, Inc. v. Lesh*, 114 A.3d 527, 529 n.3 (Del. 2014) (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. June 16, 2005)).

[264] *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 468 (Del. Ch. June 14, 1977).

[265] *Ainslie v. Cantor Fitzgerald, L.P.*, 2023 WL 106924, at *22 (Del. Ch. Jan. 4, 2023).

[266] *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020).

"closely scrutinize[s] [them] as restrictive of trade."[267] "Under Delaware law, a covenant not to compete must: (1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable."[268] "The reasonableness standard permits [restricting parties] to enforce restrictive covenants, but only where the circumstances show it is fair and reasonable to do so."[269]

Here, the SPA's restrictive covenants are unreasonable. To start, Stephen's noncompete lasts ten years.[270] Only one Delaware case has found a ten-year restrictive covenant reasonable, but it is coupled with a tightly circumscribed geographic scope.[271]

---

[267] *Centurion Serv. Grp., LLC v. Wilensky*, 2023 WL 5624156, at *2 (Del. Ch. Aug. 31, 2023).

[268] *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018).

[269] *Ainslie*, 2023 WL 106924, at *22.

[270] *See Id.* at *19 (holding a four-year duration might be in the range of reasonableness for a "more tailored" restrictive covenant, but finding four years unreasonable when coupled with other overbroad restrictions); *see also Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *2 n.5 (Del. Ch. Apr. 19, 2006) (stating noncompete agreements covering limited areas for two or fewer years generally have been held to be reasonable and citing *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *14 (Del. Ch. Oct. 23, 2002) (concluding three-year restrictive covenant is unreasonable and thus correcting it to two years instead)).

[271] *See Tull v. Turek*, 38 Del.Ch. 182, 192–93 (Del. 1958) ("The seller agrees that she will not directly or indirectly, alone or with others, in her name or in any other name, engage in the business of operating and conducting a sanitarium or hospital in New Castle County and State of Delaware, for a period of ten years from the date hereof.").

The restrictions also exceed Buyer's reasonable interests, because Stephen is prohibited from competing against both the Company and Harbor. A buyer "has a legitimate business interest in protecting the goodwill it purchased when it bought [the Company], and the confidential information about [Company] operations that [Seller] knows or could access."[272] But that legitimate interest only supports reasonable restrictions "in the goodwill and competitive space it purchased from [Seller] in the market [Company] serves;" it does not extend to Buyer's own competitive space.[273]

I agree with Stephen that these restrictive covenants are unreasonable. But in this case, that does not end the matter. "In some circumstances, a court may use its discretion to blue pencil an overly broad non-compete to make its restrictions more reasonable . . . ."[274] "Delaware courts are hesitant"[275] to exercise this "mighty . . . blue pencil."[276] "[D]isparate bargaining power . . . leads the Court to conclude that when a restrictive covenant is unreasonable, the Court should strike the provision in its entirety."[277] Blue penciling restrictive covenants often can "create a 'no-lose'

---

[272] *Kodiak Building P'rs v. Adams*, 2022 WL 5240507, at *11 (Del. Ch. Oct. 6, 2022).

[273] *Id.* at *12.

[274] *FP UC Hldgs.*, 2020 WL 1492783, at *8.

[275] *Kodiak*, 2022 WL 5240507, at *4.

[276] *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1015 (Del. Ch. June 22, 2005).

[277] *Kodiak*, 2022 WL 5240507, at *4 n.49 (internal quotation marks omitted) (quoting *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *11 (Del. Ch. Mar. 16, 2011)).

situation for [the enforcing party]" and harms the weaker party.[278] "The employer receives what amounts to a free ride on a contractual provision that the employer is well aware would never be enforced" because "for every covenant that finds its way to court, there are thousands which exercise an in terrorem effect on employees who respect their contractual obligations and on competitors who fear legal complications if they employ a covenantor."[279] Thus, blue penciling or partially enforcing restrictions on employees with inferior leverage generally creates "[legal] incentives . . . for employers [who] ask for as much as possible, with the expectation that [they] will at least get what [they're] entitled to should the matter go to court."[280]

A sale of a business typically does not involve disparate bargaining power; that is why it is well-established that "covenants not to compete in the context of a

---

[278] *Id.*; *see Sunder Energy v. Jackson*, 2023 WL 8166517, at \*24 (Del. Ch. Nov. 22, 2023) ("The differences in bargaining power between repeat-player businesses and individuals suggests that when a restrictive covenant is unreasonable, the court should strike the provision in its entirety."); *see also* Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 689–94 (2008) ("The blue pencil doctrine permits employers to overreach, and in so doing, harms employees."); *Lyons Ins. Agency v. Wark*, 2020 WL 429114, at \*1 (Del. Ch. Jan. 28, 2020) ("[C]ourts will decline to enforce contractual obligations, no matter how clear or sincerely intended when entered," "when such enforcement is inimical to public policy . . . ."); *id.* at \*4 ("[P]ublic policy exceptions [dictate against enforcing] oppression in employment contracts . . . . Because of this policy, Delaware imposes certain limits on enforcement of employment non-compete agreements.").

[279] Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 Neb. L. Rev. 672, 689–94 (2008).

[280] Charles A. Sullivan, *The Puzzling Persistence of Unenforceable Contract Terms*, 70 Ohio St. L.J. 1127, 1151 (2009).

business sale are subject to a 'less searching' inquiry."[281]  A bargain struck between

equals carries less risk of one party complying out of fear.  Where the restricted party

holds the cards, Delaware has applied the "rule of partial enforcement," "restricting

[the overbroad covenant] to its proper sphere and enforcing it only to that extent."[282]

And so, whether the Court should apply the rule of partial enforcement and "blue

pencil the . . . Agreement's non-compete [requires] a fact-intensive" consideration

of the equities that the Court may not be able to resolve at the pleadings stage.[283]

---

[281] *Kodiak*, 2022 WL 5240507, at *4; *see Knowles-Zeswitz Music v. Cara*, 260 A.2d 171, 175 (Del. Ch. Nov. 25, 1969) (explaining that "courts should be less prone to enforce [restrictive] covenants" where "the sale of a business is not involved").

[282] *See John Roane, Inc. v. Tweed*, 33 Del. Ch. 4, 18 (Del. 1952) (finding that defendant was not of inferior bargaining power, that defendant was offered choices and chose the type of restrictive covenant at issue, wishing its benefits and seeking to repudiate its burdens, and holding the rule of partial enforcement for an overbroad restrictive covenant should apply); *see also* Leo E. Strine, *Categorical Confusion:  Deal Protection Measures In Stock-For-Stock Merger Agreements*, 56 Bus. Law. 919, 941 n.71 (2001) ("[T]o the extent possible the court should not strip a merger partner of all of its contractual deal protections because those protections are unenforceable to their fullest written extent. Instead, the court should endeavor to pare away only the forbidden excess, leaving the merger partner with the benefits of those protections that fall within recognized standards of acceptability.").

[283] *FP UC Hldgs.*, 2020 WL 1492783, at *8 (denying the motion to dismiss for overbroad restrictive covenants but refusing to blue pencil at the pleadings stage); *see C & J Energy Servs. v. City of Miami Gen. Empls.*, 107 A.3d 1049, 1053 (Del. 2014) (holding that "mandatory injunctions should only issue with the confidence of findings made after a trial or on undisputed facts" and that blue penciling a contract without such factual support "is not an appropriate exercise of equitable authority"); *see also In re Toys "R" Us*, 877 A.2d at 1022 ("I need not and do not reach [plaintiffs'] argument that this court should either strike down [the agreement's] provisions altogether or blue-pencil them back to reasonable limits, all before a trial has even been held.  To grant that sort of mandatory relief would, in my view, be inappropriate on disputed facts . . . .").

Here, Stephen agreed to the restrictive covenants in the context of selling his business, and Buyer has alleged sufficient facts indicating Stephen held the cards. Buyer shows that three times it suggested SPA edits, and three times Stephen rejected Buyer's proposals.[284] Stephen regularly exercised power over Buyer, dismissing or evading Buyer's requests during negotiations.[285] Stephen even asserted his acumen over Buyer in response to Buyer's concerns that the Company's financial disclosures did not express compliance with Generally Accepted Accounting Principles: "I like the existing wording – it seems pretty standard to me as a CPA."[286] And Plaintiffs argue Stephen "hotly and at length negotiated" the restrictive covenants.[287] While Stephen contends his bargaining power "does not make [the noncompete] any more enforceable," that remains to be seen.[288] This

---

[284] Compl. ¶¶ 59–62 ("Seller's counsel rejected the document and noted that Seller's last draft of the SPA was 'our best and final offer.'"); *id.* ¶¶ 67–70 (showing Buyer asserting its "understanding [that Seller's] side was okay with [Buyer] changes to the financials section absent a call to make any necessary clarifications or discuss" and Seller authoritatively replying "[w]e are not changing the wording at this point"); *id.* ¶¶ 73–77.

[285] *Compare Id.* ¶ 51 (indicating Buyer requested Stephen identify "what actions [he had] taken regarding the change to [Company] billing model," whether he "communicated that change to employees or clients," and that Stephen provide these communications with the number of clients who received them) *with id.* ¶¶ 52–54 (indicating Seller never directly answered Buyer's requests and refused to provide any communications); *see id.* ¶ 79 (showing Seller's dismissal of Buyer's fourth-quarter concerns with Buyer's own due diligence: "We are standing behind the financials and books and records. Buyer has had an opportunity to calculate its own rates based on those numbers").

[286] *Id.* ¶¶ 67–68.

[287] Hr'g Tr. 83; *see* Compl. ¶ 310.

[288] Hr'g Tr. 43.

action may well present the opposite side of the blue penciling coin, where a seller with heightened bargaining power negotiates overbroad restrictions, banking on this Court striking the restrictions entirely.[289]

While rewriting an arms-length contract to "make it more reasonable as a matter of equity" is no small thing,[290] on this record, Plaintiffs have adequately pled facts indicating the context of these restrictive covenants may conceivably present a rare instance where equity and public policy might require blue penciling. But I cannot resolve this uncertainty without the "confidence of findings made after a trial or on undisputed facts."[291]

### E. Completely Compliant Is No Longer A Party To This Action.

Finally, Plaintiffs bring Count III, for misappropriation of trade secrets, against Stephen and Completely Compliant. Defendants argue Plaintiffs failed to establish "the existence of trade secrets and any actual or threatened misappropriation."[292] "The elements of a misappropriation of trade secrets claim

---

[289] *Compare id.* at 44 *with Kodiak*, 2022 WL 5240507, at *4 n.49 ("It seems likely that many [overbroad non-compete agreements], perhaps most, reflect the incentives the law has created for employers: ask for as much as possible, with the expectation that you will get at least what you're entitled to should the matter go to court." (quoting Charles A. Sullivan, *The Puzzling Persistence of Unenforceable Contract Terms*, 70 Ohio St. L.J. 1127, 1151 (2009)).

[290] *FP UC Hldgs.*, 2020 WL 1492783, at *8.

[291] *C & J Energy*, 107 A.3d at 1053–54.

[292] DOB 28.

66

are . . . well defined. A party may obtain injunctive relief and damages against one who acquires, uses, or discloses a trade secret obtained through improper means."[293] "To maintain a successful claim for misappropriation of trade secrets, a plaintiff must show both the existence of a trade secret and its misappropriation."[294] Complaints that plead the existence of a trade secret with overly vague, threadbare, and factually unsupported conclusory allegations will be dismissed.[295]

### 1. Plaintiffs Made A Prima Facie Showing This Court Has Personal Jurisdiction Over Completely Compliant.

As a gating issue, Defendants argue this Court lacks personal jurisdiction over Completely Compliant because Completely Compliant has no Delaware presence[296] and did not sign the SPA, or even exist when the SPA closed. Plaintiffs contend Completely Compliant is Stephen's affiliate bound by the SPA's Delaware forum

---

[293] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002).

[294] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 589 (Del. Ch. Apr. 23, 2010).

[295] *See MHS Cap.*, 2018 WL 2149718, at *14 (dismissing a claim for trade secret misappropriation for failure to allege the existence of a trade secret); *see also AlixPartners, LLP v. Benichou*, 250 A.3d 775, 783 (Del. Ch. May 10, 2019) (holding plaintiff well-pled the existence of a trade secrete because "the alleged categories of documents are not overly vague or so broad as to be meaningless").

[296] Compl. ¶ 15 ("Completely Compliant, LLC is a Wyoming limited liability company, with its principal office at 1309 Coffeen Avenue Suite 1200, Sheridan, Wyoming 82801, and its headquarters at 8450 Tyco Road, Suite D, Vienna, Virginia 22182.").

selection clause[297] because "it was foreseeable that Completely Compliant would be bound by the SPA, including its forum selection clause."[298]

"If the Court has not held an evidentiary hearing, plaintiffs need only make a *prima facie* showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[299] Plaintiffs may do so by showing a defendant consented to jurisdiction.[300] When "parties agree to litigate in a particular forum" through a forum selection clause "they consent . . . [to] personal jurisdiction in that forum."[301]

The SPA has a Delaware forum selection clause.[302] Completely Compliant did not sign the SPA or agree to its forum selection clause; but this Court may still

---

[297] PAB 54.

[298] Hr'g Tr. 104.

[299] *P'rs & Simons, Inc. v. Sandbox Acqs.*, 2021 WL 3161651, at *3 (Del. Ch. July 26, 2021); *see id.* at *4 (discussing foreseeability test as one way a party can be closely related to an agreement, that "Delaware courts have applied this concept in the controller context, where the signatory controls the non-signatory," and that "the non-signatory must bear a clear and significant connection to the subject matter of the agreement").

[300] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 801 (quoting *Nat'l Grp. Hldg. v. Carlyle Inv. Mgmt.*, 67 A.3d 373, 381 (Del. 2013) and citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985)).

[301] *P'rs & Simons*, 2021 WL 3161651, at *3.

[302] SPA § 9.9 ("Each party to this Agreement, by its execution hereof, hereby (a) irrevocably submits to the exclusive jurisdiction of the courts with jurisdiction over the State of Delaware for the purpose of any and all actions, suits, or proceedings arising in whole or in part out of, related to, based upon, or in connection with this Agreement or the subject matter hereof, or the transactions contemplated hereby (whether sounding in contract, tort, statute, or otherwise) . . . .").

bind a nonsignatory to a forum selection clause when (1) "the forum selection clause [is] valid," (2) "the defendants are . . . closely related to the contract," and (3) "the claim arise[s] from their standing relating to the . . . agreement[.]"[303] A plaintiff must satisfy all three requirements in order to bind a nonsignatory to an agreement.[304]

To satisfy the closely-related requirement, the plaintiff must show either that it was foreseeable that the nonsignatory would be bound by the agreement or that the nonsignatory received a direct benefit from it.[305] The "foreseeability inquiry rests on the public policy that forum selection clauses promote stable and dependable public relations, and it would be inconsistent with that policy to allow the entities through which one of the parties chooses to act to escape the forum selection clause."[306] The foreseeability inquiry for a nonsignatory with a sufficiently close relationship to the agreement sounds in promissory estoppel: having promised to litigate in a particular forum, a party "cannot later renege on its promise by using a controlled affiliate to escape the forum selection provision."[307] "On this basis, cases have applied the foreseeability inquiry . . . in the controller context, where the

---

[303] *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019).

[304] *P'rs & Simons*, 2021 WL 3161651, at *4.

[305] *Id.*

[306] *Id.*

[307] *Fla. Chem. Co., LLC v. Flotec Indus., Inc.*, 262 A.3d 1066, 1090 (Del. Ch. Aug. 17, 2021).

signatory controls the non-signatory involved in the transaction."[308] This foreseeability test extends even to entities who become affiliates of the controller after the agreement's execution,[309] especially in the presence of "strong textual signals that a [p]erson's status as an [a]ffiliate is determined when contractual compliance is measured."[310] That said, it does not extend "to all non-signatories that a signatory happens to control" but only to those that "bear a clear and significant connection to the subject matter of the agreement."[311]

Plaintiffs have met their burden at this stage. It is undisputed that the SPA's forum selection clause is valid. And Plaintiffs fairly plead that Completely Compliant is closely related to the SPA because (1) it is controlled by Stephen[312] and

---

[308] *Neurvana*, 2019 WL 4464268, at \*5 (internal quotation marks omitted) (quoting *Weygandt v. Weco, LLC*, 2009 WL 1351808, at \*5 n.26 (Del. Ch. May 14, 2009)).

[309] *See, e.g. Symbiont.io, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at \*31 (Del. Ch. Aug. 13, 2021) (holding that an entity that was not an affiliate of defendant when defendant executed the agreement became bound by a noncompete provision when it became defendant's affiliate) (discussing *Universal Studios, Inc. v. Viacom, Inc.*, 705 A.2d 579, 591 (Del. Ch. May 15, 1997) (binding a later-in-time affiliated entity to a noncompete)).

[310] *Id.* at \*29–31 (identifying such strong textual signals in the agreement's definition of "Affiliate" with "the adjective 'any' to frame its scope expansively as extending to 'any specified Person,'" its lack of limiting language to control the scope, and the use of equity ownership as an assessment of control).

[311] *P'rs & Simons*, 2021 WL 316151, at \*4 (quoting *Neurvana*, 2019 WL 4464268, at \*6).

[312] *See* Compl. ¶¶ 288–89, 292; *and see* PAB 60 (showing (1) Stephen owns Completely Compliant, (2) Completely Compliant's first address was five miles away from Stephen and now is located at his personal residence, (3) Completely Compliant's telephone number registration is in Stephen's name, and (4) Completely Compliant's voicemail recording is by Stephen).

(2) bears a clear and significant connection to the subject matter of the agreement[313] as the alleged "entity through which [Stephen] [breached] one of its contractual obligations."[314] While Completely Compliant did not exist when the SPA was signed, the SPA bears textual signals of an intent to assess control at the time of contractual compliance, using equity ownership in its definition of "Affiliate." [315] As in *Florida Chemical Company v. Flotek Industries*, "when [Stephen] bound [himself] to the Delaware Forum Provision for any claim arising out of or relating to the [SPA], [Stephen] made that promise on behalf of [himself] and [Completely Compliant as a closely related subsidiary]."[316] Finally, the claim arises from

---

[313] *See* Compl. ¶ 294 ("[Completely Compliant] offers the same services as those of the Company and the Buyer, as defined under the terms of the SPA."); *id.* ¶ 299 ("Based upon [Completely Compliant's] own written representations (including those on its website), it engages in the Company's Business that was sold to Buyer under the SPA in exchange for millions of dollars, and it is doing so within the Territory defined under Section 6.7.2 of the SPA.").

[314] *See Fla. Chem.*, 262 A.3d at 1093 (holding nonsignatory defendant had "a clear and significant connection" to the Purchase Agreement because it was the entity through which the parent carried out one of its contractual obligations).

[315] SPA § 1.2 (defining "Affiliate" to "mean[], as to any Person, any other Person controlling, controlled by or under common control with such Person. For the purposes of this definitions, 'controlling,' 'controlled,' and 'control' means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise."); *Symbiont.io*, 2021 WL 3575709, at *29 ("Equity ownership can fluctuate and that . . . assessment of control must account for the shares outstanding when contractual compliance is measured.").

[316] 262 A.3d at 1092.

Completely Compliant's standing relating to the agreement because "the claim[] asserted . . . arise[s] from the [SPA]."[317]

Plaintiffs have made a prima facie showing that this Court may exercise personal jurisdiction over Completely Compliant for purposes of Count III. But in any event, Count III is dismissed for failure to state a claim.

### 2. Plaintiffs Failed To State A Claim For Misappropriation Of Trade Secrets Against Completely Compliant.

Count III asserts Stephen and Completely Compliant have misappropriated Labyrinth and Harbor trade secrets. Plaintiffs allege "[Stephen] sold and Buyer acquired the exclusive right to use Company trade secrets pursuant to the SPA."[318] From there, Plaintiffs allege Stephen wrongfully emailed Labyrinth trade secrets to

---

[317] *Cap. Grp. Co., Inc. v. Armour*, 2004 WL 2521295, at *7 (Del. Ch. Oct. 29, 2004) (holding "a suit to enforce [a stock repurchase agreement] with respect to stock held in the Trust . . . clearly arise[s] from [the nonsignatory's] standing relating to the SRA"); *see* SPA § 6.7.2 ("Seller and Robert Urich shall not, and shall not permit any of his Affiliates, directly or indirectly, except for Buyer and the Company (i) engage in or assist others in engaging in (1) the Business . . . ."); *see also id.* § 4.8(b) ("Other than the Company, no Person has any right, title, or interest in or to any of the Company Software."); *id.* at § 1.2 (defining "Company Software" to "mean[] (a) all proprietary software and technology, including all programs, applications, source code, object code, algorithms, models, methodologies, trade secrets, copyrights, patents, and other proprietary technology . . . , including any customizations, modifications, updates, new releases, new versions and other derivative works related thereto as of the date hereof, and (b) all Intellectual Property rights, title and interests in and to each of the foregoing, in each case, with respect to the Intellectual Property . . . that was developed by or on behalf of the Business."); *id.* at § 1.2 (defining "Affiliate" to "mean[] . . . any other Person controlling, controlled by, or under common control with such Person"); Compl. ¶ 334 ("[Stephen] Urich and Completely Compliant are in possession of Plaintiffs' Trade Secrets . . . .").

[318] Compl. ¶ 330.

himself,[319] his "misconduct and [his] knowledge of Plaintiffs' Trade Secrets . . . impute[s] to Completely Compliant,"[320] and "Stephen and Completely Compliant threaten to and will inevitably use and/or disclose the Plaintiffs' Trade Secrets."[321] Plaintiffs assert that "the Delaware Uniform Trade Secrets Act ("DUTSA")," "the California Uniform Trade Secrets Act ("CUTSA")," "the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), and "the Virginia Uniform Trade Secrets Act ("VUTSA")" govern various aspects of the claim.[322] Defendants contend "the Complaint fails to allege a basis for DUTSA or PUTSA to apply."[323] Then, Defendants argue "the Complaint fails to state a claim under any cited statute."[324]

Where a conflict of law exists between different jurisdictions, "Delaware courts apply 'the most significant relationship test from the Restatement (Second) of Conflict[ ] of Laws.'"[325] "[T]he 'most significant relationship' test entails a fact-

---

[319] *Id.* ¶ 111.

[320] PAB 36–37.

[321] Compl. ¶ 335.

[322] *Id.* ¶ 337.

[323] DOB 25.

[324] *Id.* at 27 n.7.

[325] *Dow Chem. Co. v. Organik Kimya Hldg. A.S.*, 2018 WL 2382802, at *6 (Del. Ch. May 25, 2018) (quoting *UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *3 (Del. Ch. Dec. 14, 2005)); *see Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773 (Del. Ch. Feb. 18, 2014) ("[I]f the Court finds that an actual conflict exists, then it applies the 'most significant relationship test,' as set out in the Restatement (Second) of Conflict of Laws, to determine which jurisdiction's laws to apply.").

intensive inquiry that often is inappropriate to a motion to dismiss."[326]  But, "[i]f application of the competing laws would yield the same result, then no genuine conflict exists, 'and the Court should avoid the choice-of-law analysis altogether.'"[327]  "Forty-eight states and the District of Columbia have adopted the Uniform Trade Secrets Act ("UTSA")."[328]  Here, Defendants have acknowledged that "the elements of each statute appear sufficiently similar."[329]  Plaintiffs further confirm the "Defendants do not identify any material differences among the statutes," and "the DUTSA, PUTSA, CUTSA, and VUTSA . . . *all* provide" similar pleading requirements and similar definitions for "misappropriation."[330]  "[B]ecause [DUTSA, PUTSA, CUTSA, and VUTSA] would produce the same decision no matter which state's law is applied, there is no real conflict and a choice of law analysis would be superfluous.  Thus, I analyze [the] claim[] under Delaware law."[331]

---

[326] *Dow Chem.*, 2018 WL 2382802, at *6.

[327] *Vichi*, 85 A.3d at 773 (quoting *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010)).

[328] *Dow Chem.*, 2018 WL 2382802, at *6.

[329] DOB 27 n.7.

[330] PAB 28; *see Vichi*, 85 A.3d at 773 ("[T]he laws [do not] actually conflict on a relevant point.").

[331] *Great Am. Opportunities, Inc. v. Cherrydale Fundraising LLC,* 2010 WL 338219, at *8 (Del. Ch. Jan. 29, 2010).

74

The Complaint "must show both the existence of a trade secret and its misappropriation."[332] "[T]o qualify as a 'trade secret' information must both derive independent economic value from not being generally known or readily ascertainable and be subject to reasonable efforts to maintain its secrecy."[333] Relevant here, DUTSA defines "misappropriation" as:

> a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> b. Disclosure or use of a trade secret of another without express or implied consent by a person who: 1. Used improper means to acquire knowledge of the trade secret; or 2. At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade [secret] was: A. Derived from or through a person who had utilized improper means to acquire it; B. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or C. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.[334]

The parties dispute what defines the universe of Company trade secrets subject to misappropriation. Defendants contend "[t]he Complaint pleads that Section 4.8 'defined the Intellectual Property sold under the SPA,'"[335] and Section 4.8 of the SPA defines "all of the Company's trade secrets,"[336] and so because

---

[332] *Beard Rsch.*, 8 A.3d at 589.

[333] *Id.*

[334] 6 Del. C. § 2001(2).

[335] DRB 16 (quoting Compl. ¶ 268).

[336] *Id.*

"nothing listed on [Schedule 4.8(a)(i)] is at issue," the Company fails to sufficiently identify any misappropriated trade secrets.[337]   Plaintiffs point to the UTSA's definition of 'trade secret' and contend "the parties never 'agreed' that Schedule 4.8(a)(i) of the SPA consists of 'all' of the Company's trade secrets, much less as the term 'trade secret' as defined under the statutes."[338]

For purposes of this analysis, this opinion accepts Plaintiffs' argument.  Even proceeding under this assumption, Plaintiffs must still plead (1) a trade secret exists, (2) "[t]he plaintiff communicated the trade secret to the defendant," (3) the communication followed an express or implied understanding "that the defendant[s] would maintain the secrecy of the information," and (4) Stephen and Completely Compliant misappropriated a trade secret "within the meaning of that term as defined in . . . DUTSA."[339]   This opinion also assumes that at least some of the information that Stephen possessed reasonably constituted Company trade secrets,[340] that the information was communicated to Stephen, and that it was

[337] *Id.*

[338] PAB 32.

[339] *Alarm.com Hldgs., Inc. v. ABS Cap. P'rs, Inc.*, 2018 WL 3006118, at *7 (Del. Ch. June 15, 2018).

[340] Compl. ¶ 111; *see Liveware Publ'g, Inc. v. Best Software, Inc.,* 252 F.Supp.2d 74, 85 (D. Del. 2003) (noting that a customer list is "precisely the type of business information which is regularly accorded trade secret status . . . ."); Compl. ¶ 111 (indicating Stephen emailed himself a "Labyrinth Monthly Management Meeting" document, containing strategy and operational details for the Company); *but see AlixPartners*, 250 A.3d at 783

communicated pursuant to an express or implied understanding that Stephen would

maintain the secrecy of the information.[341]  And so, this decision assumes Plaintiffs

satisfied the first three elements of a DUTSA claim.[342]

The Complaint does not state a claim against Completely Compliant.  "Under

the facts alleged in the complaint, the claim [] founders on the fourth element

because [Plaintiffs] ha[ve] not pled facts supporting a reasonable inference of

---

(finding that notes from meetings constituted "numerous methods, techniques, and processes for conducting and marketing [company's] consulting business" and satisfied a showing of trade secrets at the pleading stage); Compl. ¶ 111 (indicating Stephen emailed himself "open invoices, which included client names and other details"); *but see Great Am. Opportunities*, 2010 WL 338219, at *21 (determining post-trial that an order status report listing clients' names and the status of orders constituted a company trade secret); Compl. ¶ 111 (indicating Stephen emailed himself "copies of the Company's Balance Sheet and Profit and Loss Statement"); *but see Hyman Co., Inc. v. Brozost*, 119 F. Supp. 2d 499, 501, 505 (E.D. Pa. Nov. 7, 2000) (finding defendant "had access to and was given, when needed, financial information on the profitability of many of the individual Hyman stores, including the actual profit and loss statements" and holding "[t]he information to which [defendant] was privy during the course of his employment with [plaintiff] regarding [plaintiff's] lease terms, conditions and negotiations and the profitability of [plaintiff's] stores constitute such confidential and proprietary information as to be worthy of protection as a trade secret"); Compl. ¶ 111 (indicating Stephen emailed himself Company financial spreadsheets).

[341] *See* SPA § 6.7.1 ("From the Closing Date until the tenth anniversary of the Closing, Seller and Robert Urich shall . . . hold and use . . . in confidence any and all information, whether written or oral, concerning the Company and Buyer, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller . . . ."); *see also* Consulting Agreement § 5.1 ("Consultant hereby recognizes and affirms Consultant's responsibility to preserve and protect all Confidential Information, and will not use or disclose any Confidential Information at any time, except to the Company and on the Company's behalf, as may be required in the course of performing the Services . . . ."); *Alarm.com*, 2018 WL 3006118, at *7.

[342] *Alarm.com*, 2018 WL 3006118, at *7.

misappropriation" by Completely Compliant.[343]  The Complaint must provide "specific details suggesting how [Completely Compliant] impermissibly used [or acquired] the [trade secret]."[344]  Plaintiffs' reliance "exclusively on 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [does] not suffice."[345]

The Complaint fails to plead Completely Compliant ever acquired Labyrinth trade secrets.  I have agreed to assume for purposes of this analysis that Stephen improperly acquired Labyrinth trade secrets through a series of emails from October 4 through December 27, 2021.  Plaintiffs do not offer any other facts indicating Completely Compliant actually has, or has used, Labyrinth's trade secrets.[346]  Instead, Plaintiffs ask the Court to impute Stephen's misappropriation to Completely Compliant.  Under principles of agency law, a corporate agent's knowledge and actions within the scope of their authority are imputed to the entity.[347]  And so, when agents of a corporation "engage in wrongdoing, the corporation itself is a wrongdoer."[348]  Plaintiffs rely entirely on this legal fiction to impute Stephen's

---

[343] *Id.*

[344] *Brightstar Corp. v. PCS Wireless, LLC*, 2019 WL 3714917, at *8 (Del. Ch. Aug. 7, 2019).

[345] *Id.*

[346] Compl. ¶ 339.

[347] *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 302 (Del. Ch. Mar. 26, 2015).

[348] *Id.*

tortious conduct to Completely Compliant, citing *BrandRep, LLC v. Ruskey* for the general rule that an individual fiduciary or agent's knowledge is imputed to an entity.[349]

But Stephen improperly obtained Labyrinth's trade secrets a year before Completely Compliant was formed.[350] Plaintiffs make no effort to argue or explain why Stephen's conduct should be imputed to an entity he formed months after that conduct. In *BrandRep*, the fiduciary defendant allegedly misappropriated BrandRep's trade secrets while he owned that company, and then gave the trade secrets to his affiliates and sold his ownership in BrandRep.[351] The affiliates were in existence when the alleged misappropriation occurred; thus, the fiduciary defendant was an agent of the acquiring entities, and "his alleged breaches . . . [were] imputed to the [e]ntity [d]efendants."[352] But here, Stephen could not have been an agent of Completely Compliant when he took Labyrinth's sensitive information in 2021, because Completely Compliant had not been formed yet.

Plaintiffs have offered no facts or law that supports imputing Stephen's tortious conduct to the later-created Completely Compliant. In the absence of

---

[349] PAB 36–37 (citing *BrandRep, LLC v. Ruskey*, 2019 WL 117768, at *8 (Del. Ch. Jan. 7, 2019).

[350] *Compl.* ¶ 290 ("The Competing Business was incorporated on December 1, 2022.").

[351] *BrandRep*, 2019 WL 117768, at *2 (Del. Ch. Jan. 7, 2019).

[352] *Id.* at 6.

imputing pre-formation conduct, Plaintiffs must allege facts showing Completely Compliant obtained or used Labyrinth trade secrets; they have none.

Instead, Plaintiffs suspect that "[b]ecause [Stephen] also formed and began operating the competing business in violation of the SPA, [Stephen] and Completely Compliant threaten to and will inevitably use and/or disclose the Plaintiffs' Trade Secrets."[353] Potential misuse does not establish actual misuse.[354] Possessing a trade secret and investing in (or forming) a Labyrinth competitor, "without more, [does] not constitute [Stephen's] improper use" of a trade secret.[355] Plaintiffs merely identify circumstances that support an inference that Stephen and Completely Compliant compete with the Company; but they fail to establish a reasonably conceivable set of circumstances under which Stephen and Completely Compliant improperly acquired, used, or disclosed Company trade secrets.[356]

---

[353] Compl. ¶ 335.

[354] *Callaway Golf Co. v. Dunlop Slazenger Grp. Am., Inc.*, 318 F.Supp.2d 205, 216 (D. Del. 2004) (holding conclusory allegations are not enough for misappropriation of trade secrets claims); *see Savor*, 2004 WL 1965869, at *9 n.92 (explaining opportunity to acquire is insufficient to support an inference of misappropriation (citing *SEC v. Truong*, 98 F.Supp.2d 1086, 1101 (N.D. Cal. 2000)).

[355] *Alarm.com*, 2018 WL 3006118, at *8 (dismissing plaintiff's misappropriation claim regardless of plaintiff's identification of a trade secret and a party's investment in a competing business, because plaintiff failed to show the trade secret was misappropriated).

[356] *Id.* ("Even given this relaxed pleading standard, [the] complaint does not support a reasonably conceivable inference of misappropriation. [The plaintiff] relies only on [the defendant's] investment in [a competitor], made approximately a year after . . . [leaving] Alarm . . . . [T]hese circumstances only support an inference that [the defendant] invested in a company that competes with [the plaintiff].").

The Complaint fails to state a claim that Completely Compliant misappropriated Labyrinth trade secrets. I defer the merits of the claim against Stephen until trial.

### 3. Harbor Fails To Allege Stephen And Completely Compliant Misappropriated Harbor Trade Secrets.

Count III claims Stephen and Completely Compliant misappropriated not only Labyrinth's trade secrets, but Harbor's as well.[357] Plaintiffs must adequately plead the existence of a trade secret.[358] Alleged categories of documents must not be overly vague or so broad as to be meaningless.[359] Plaintiffs must identify the existence of Harbor information that "derives independent economic value, actual or potential, from not being generally known to . . . persons who can obtain economic value from its disclosure or use . . . and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[360] Threadbare complaints purporting the existence of trade secrets, without any supporting factual detail, will be dismissed.[361]

---

[357] *See, e.g.,* Compl. ¶ 334.

[358] *AlixPartners*, 250 A.3d at 782.

[359] *Id.* at 783.

[360] PAB 28 (citing 6 Del. C. § 2001(4); 12 Pa. C. S. § 5302; Cal. Civ. Code Ann. § 3426.1; and Va. Code Ann. § 59.1-336).

[361] *MHS Cap.*, 2018 WL 2149718, at *14 (holding a threadbare complaint for misappropriation of trade secrets "fail[ed] to state a claim for trade secret

81

Plaintiffs do not identify any additional Harbor trade secrets other than Labyrinth's. The Complaint repeatedly identifies Harbor's trade secrets as Labyrinth's.[362] While Harbor bought at least some of Labyrinth's trade secrets under the SPA, Plaintiffs have not alleged Completely Compliant's misappropriation of those.[363]

The Complaint's only other connection to Harbor trade secrets is Stephen's Consulting Agreement. The Complaint alleges Stephen "was further given access to trade secrets of Buyer pursuant to the Stephen Consulting Agreement."[364] But Plaintiffs do not identify any Harbor trade secrets, let alone allege Stephen misappropriated any.[365] The Consulting Agreement does not even establish that

---

misappropriation" because "at the outset, . . . [plaintiff] ha[d] not alleged the existence of a trade secret").

[362] Compl. ¶ 334 (referring to "the Company's [Labyrinth's]" trade secrets); *id.* ¶ 327 ("[A]s set forth above, Plaintiffs' trade secrets are comprised of, *inter alia*, the Company's . . . ."); *id.* ¶ 329 ("[Labyrinth's] trade secrets are the exclusive property of Plaintiffs . . . ."); *id.* ¶ 330 ("Stephen sold and Buyer acquired exclusive right to use Company trade secrets . . . ."); *id.* ¶ 285 ("[Stephen] had emailed himself copies of the Company's intellectual property and trade secrets . . . in disregard for his contractual obligations, including those set forth at Section 6.7.1 of the SPA and Section 5.1 of the Consulting Agreement."); *id.* ¶ 339 ("[Stephen] would now be unfairly benefitting from the trade secrets he took from the Company . . . .").

[363] *See, e.g., id.* ¶ 330. I do not reach whether Stephen misappropriated any Labyrinth trade secrets purchased by Harbor.

[364] *Id.* ¶ 331.

[365] *See Beard Rsch.*, 8 A.3d at 589 (indicating a plaintiff must show both "both the existence of a trade secret and its misappropriation").

82

Harbor gave Stephen access to its trade secrets.[366] Section 5.1 states only that Harbor "***may*** make disclosures to Consultant of confidential information . . . including but not limited to . . . certain or other trade secrets."[367] "The text of [the mandatory/permissive canon] is entirely clear, and its content so obvious as to be hardly worth saying . . . . The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive."[368] Section 5.1 says Harbor might disclose trade secrets to Stephen; nothing in it, or the Complaint, says Harbor actually did. And the phrase "certain or other trade secrets" does not specify such trade secrets would even be Harbor's, as opposed to Labyrinth's. Plaintiffs' invocation of the Consulting Agreement fails to allege Stephen had knowledge of, or misappropriated, any properly identified Harbor trade secret.[369]

Count III is dismissed against Completely Compliant, and against Stephen to the extent it claimed misappropriation of Harbor trade secrets that were not purchased with Labyrinth. Completely Compliant is no longer a party to this action.

---

[366] *Alarm.com*, 2018 WL 3006118, at *6 ("To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead four elements: (i) a trade secret exists. (ii) The plaintiff communicated the trade secret to the defendant . . . .").

[367] Consulting Agreement § 5.1 (emphasis added).

[368] Antonin Scalia & Bryan A Garner, *Reading Law: The Interpretation of Legal Texts* 112 (2012).

[369] *See Beard Rsch.*, 8 A.3d at 589.

## III.   CONCLUSION

Count III is dismissed as against Completely Compliant, and against Stephen in part.   Count IV is dismissed as to the representations regarding the rental properties.  I otherwise deny Defendants' Motion as to Counts IV, V and VII.  Robert remains a party to this action.   A reasonable interpretation of the SPA indicates it does not prohibit injunctive relief, and Stephen's bargaining power might call upon my equitable discretion to use the blue pencil for tailoring the SPA's overbroad noncompete.  I defer my disposition on the merits of Counts I, II, III as to Stephen's misappropriation of Labyrinth trade secrets, VI, VIII, and IX until trial.  The parties shall submit a stipulated implementing order.